UNITED STATES of America,
Plaintiff-Appellee,

v.

James Bailey MORRIS,
Defendant-Appellant.

No. 77–5266.

United States Court of Appeals,
Fifth Circuit.

Jan. 9, 1978.

Rehearing Denied Feb. 6, 1978.

Louis G. Mehr, Houston, Tex., for defendant-appellant.

Jamie C. Boyd, U. S. Atty., LeRoy Morgan Jahn, Robert S. Bennett, Asst. U. S. Attys., San Antonio, Tex., Rebecca D. Westfall, Asst. U. S. Atty., El Paso, Tex., for plaintiff-appellee.

Before TUTTLE, COLEMAN and RONEY, Circuit Judges.

COLEMAN, Circuit Judge.

James Bailey Morris appeals his conviction for unlawfully, knowingly, and intentionally possessing with intent to distribute approximately 177 pounds of marijuana in violation of 21 U.S.C., § 841(a)(1). The sole appellate issue is whether the trial court should have suppressed the evidence discovered in a search of the truck Morris was driving in that the border patrol officers had no probable cause to make the warrantless search. Under all the circumstances hereinafter related we are of the opinion that probable cause did exist.

On August 15, 1976, at about 4 o'clock, A.M., Border Patrol Officers Douglas Keim and Michael Hughes left their duty station in Presidio, Texas. They drove approximately twenty-four miles north on State Highway 67 and established a traffic checkpoint so as to stop north bound traffic and inquire about the nationality of passing motorists. The checkpoint, known as the Elephant Rock checkpoint, is located twenty-five miles north of the Mexican border. This was the first day the checkpoint was to be operational. United States Border Patrol officers had prepared the checkpoint the previous day by marking off distances on the highway for the placement of signs and warning lights. Since its inception the checkpoint has been operated on the average of 7½ hours per day for five days a week.

█ The trial court correctly held that the Elephant Rock checkpoint met requirements for a permanent checkpoint, as set out in United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). Morris concedes as much. He,

therefore, also concedes that the border patrol might stop, absent any suspicion, all vehicles to ask the citizenship of the passengers, United States v. Alvarez-Gonzalez, 5 Cir., 1976, 542 F.2d 226, 227–228; United States v. Madrid, 5 Cir., 1976, 531 F.2d 1329. After a stop at a permanent checkpoint, the "officers may not search private vehicles without consent or probable cause", United States v. Ortiz, 422 U.S. 891, 897, 95 S.Ct. 2585, 2589, 45 L.Ed.2d 623 (1975).

█ Probable cause to search an automobile must be based upon a belief, reasonably arising out of the circumstances known to the seizing officer, that the vehicle contains that which by law is subject to seizure and destruction, Carroll v. United States, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925). We are accordingly reduced to a review of the facts and circumstances known to the officers (and any rational inferences taken therefrom) to determine if a reasonable man would have been led to believe a crime had been or was being committed, Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); United States v. Solis, 5 Cir., 1972, 469 F.2d 1113, cert. denied, 410 U.S. 932, 93 S.Ct. 1375, 35 L.Ed.2d 594.

The vicinity of the checkpoint was one in which there was frequent traffic in illegal aliens and contraband. Officer Keim had participated in about seventy stops along the highway in question in which illegal aliens or contraband were found within the previous eighteen months.

Upon arrival at Elephant Rock, the officers set up their warning signs, flashing lights, and caution cones so as to alert drivers of approaching vehicles of the checkpoint's existence and of their responsibility to stop. The officers began their observations at about 4:30 A.M. but no vehicle arrived until Morris, traveling alone, drove up in a pickup truck at 9:30 o'clock.

After the vehicle stopped, Officer Keim, a five year member of the border patrol, approached the driver's side; Officer Hughes approached from the other side. Keim had known Morris as an area resident for about four and a half years. Almost

immediately Keim noticed that Morris had changed his normal loud, vociferous manner. He was quiet and nervous. Keim attempted to make conversation with him by asking about the large collection of cacti in the bed of the pickup. Morris said that he was taking the cacti to Houston for sale. Noticing that the pickup was not a vehicle usually driven by Morris, Keim also asked whose pickup he had. Morris answered that it belonged to David Dover. This triggered a recollection that some eight months earlier a local deputy sheriff had told Keim that Morris and Dover were to run some marijuana up from Mexico within two weeks, although time for that run had passed with nothing being reported.

Keim noticed that the cacti were not arranged in the manner customarily used when being shipped for sale. Normally, cacti are carried in cardboard boxes or crates, placed side-by-side in the vehicle. Here, all the cacti were sitting on one another in a fashion which obviously would result in damage.

Up to that point, however, Keim had taken no steps to search the truck.

Hughes then alerted Keim by pointing to something he had seen in the bed of the pickup. Keim walked around to the other side of the pickup to take a look. Hughes pointed to the corner of a black plastic bag, protruding from under the cacti, containing what appeared to be a block or some object with a squared corner. The officers on several previous occasions had seen marijuana transported in such receptacles. The longer the stop lasted the more nervous Morris became, especially after the officers began looking into the cacti. Keim asked Morris what was in the plastic bag. Morris denied any knowledge of the plastic bag or of its contents.

After stating he was going to look into the bag, Keim slit the bag open and found a marijuana brick, wrapped in sugar paper. Further inspection revealed 177 pounds of marijuana, hidden under the cacti.

■ Morris argues, vigorously, that these facts, and the inferences reasonably to be drawn from them, did not establish probable cause to take possession of the partially protruding plastic bag, to ascertain what it contained, and thereafter to uncover the 177 pounds of cargo. We agree that stale information from the deputy sheriff could not supply probable cause, *Sgro v. United States*, 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932). We also agree that nervousness when stopped, standing alone, is not enough, *United States v. Strong*, 5 Cir., 1977, 552 F.2d 138, 141.

But these aspects of the encounter were not the only elements facing the officers.

To begin with, the officers were not required to disregard what they had learned from experience about methods used in marijuana smuggling, *United States v. Reyna*, 5 Cir., 1977, 546 F.2d 103. The plastic bag, protruding from the cacti being transported in such an unusual manner was a big cloud in what might otherwise have been a clear sky. Morris' disavowal of knowledge that the plastic bag was in the cargo is analogous to the frequently presented, and rejected, false statement that the illicit transporter has lost the key to the trunk, *United States v. Reyna, supra*. That Morris was driving Dover's vehicle instead of his own, something the officers had not previously seen him do, did not have to be dismissed as of no significance in view of what the officers had previously heard from a deputy sheriff about the association between Morris and Dover.

As in *United States v. Strong, supra*, we think that the *totality* of the circumstances demonstrated to any reasonable mind that the officers were not encountering an innocent transportation of cacti to Houston; that, indeed, the patrol had sound cause to believe that *marijuana*, poorly concealed in cacti, was, in fact, the real cargo.

That being so, the judgment of the District Court is

AFFIRMED.