## UNITED STATES of America, Plaintiff-Appellant,

v.

## Hoyt Albert GAULTNEY and Francis Gilmere, Defendants-Appellees.

### No. 77-3482.

United States Court of Appeals, Fifth Circuit.

Oct. 10, 1978.

Rehearing and Rehearing En Banc Denied Nov. 27, 1978.

appearing in *Shopping Kart Food Market, Inc.,* 228 NLRB No. 190 (1977).

William L. Harper, U.S. Atty., Robert A. Boas, Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellant.

P. Bruce Kirwan, Federal Public Defender, Al M. Horn, Reber F. Boult, Atlanta, Ga., for defendants-appellees.

Before COLEMAN, GEE and HILL, Circuit Judges.

COLEMAN, Circuit Judge.

In this criminal case the government appeals the suppression of evidence by the District Court. We reverse and remand.

## I

### The Nature of the Case

In various counts, the defendants, Gilmere and Gaultney, were charged with distribution of cocaine, possession of cocaine with intent to distribute, and conspiracy to distribute cocaine. Both defendants moved before trial for the suppression of evidence seized by government officers on the day of the arrests. An evidentiary hearing was held before a magistrate, who subsequently recommended that the motions be granted. The District Judge adopted the magistrate's final report and recommendation as the order of the Court and suppressed the evidence.

The government appeals pursuant to 18 U.S.C., § 3731, and raises two questions for resolution:

(1) Whether the evidence obtained as a result of a warrantless search of Gilmere's truck, when that search was substantially contemporaneous both in time and in place with the arrest of the defendant and when the government agents had probable cause to search the vehicle, should have been suppressed for lack of a warrant issued by a neutral arbiter, and

(2) Whether the evidence obtained from Gaultney's apartment and statements made

by him after his arrest on probable cause should be excluded because the arrest was made inside his apartment without a warrant.

## II

### Gilmere's Case

There is no substantial dispute about the facts found by the magistrate. On May 18, 1977, at approximately 11:00 a. m., Special Agent James H. Williams of the Drug Enforcement Administration (DEA) met with Francis Gilmere at the Marriott Hotel in Atlanta. Williams, acting in an undercover capacity, intended to make arrangements to purchase a pound of cocaine from Gilmere, who advised Williams that it might be possible for him to purchase an additional ten pounds later in the day. Gilmere had to go to "the north side of town" to get the drugs, so the two men agreed to meet around 12:45 p. m. at Charlie Magruder's Restaurant to complete the transaction. Gilmere was to bring a sample of the larger amount of cocaine along with the one pound previously agreed upon.

Williams then returned to the DEA district office, where he monitored radio communications from other DEA agents who were surveilling Gilmere. Gilmere went north on Interstate 75, left the highway to make a telephone call, and then proceeded to a nearby waffle shop, where he met inside with an individual later identified as Hoyt Albert Gaultney. After a few minutes, Gilmere and Gaultney drove their respective vehicles to the Moonraker Apartments, where they both entered Apartment 6 in Building F–1. Immediately after they entered the apartment, the blinds on the front window, which had been open, were closed. Several minutes later, surveillance agents observed Gilmere leave the apartment, *carrying a reddish box under his arm,* and get into his truck. He was observed driving south on Interstate 75. Shortly after Gilmere departed, two men drove up in a Corvette and went inside. A few minutes later, the agents remaining on the scene observed an unknown woman (later identified as Gaultney's wife) leave the apartment and drive away in the car in which Gaultney had previously arrived. Due to lack of a pursuit vehicle she was not followed.

Williams, who was aware of all these events by radio monitoring, met Gilmere in front of the restaurant at the appointed time. Gilmere handed him a small envelope which he said contained the sample of cocaine. Inside the restaurant, the two men had a drink at the bar and discussed the pound of cocaine Williams wished to buy. Gilmere said that he wanted $22,000 for the pound *and that it was outside in his truck.* Williams then went to the men's room to field test the sample; the test gave a positive indication for cocaine. Special Agent Caron Durel, who had followed Gilmere from the Moonraker Apartments and who had been on surveillance inside the restaurant, subsequently followed Williams into the men's room, received the test results, talked to Williams about the two men who had driven by the apartment in the Corvette, and then instructed Williams to have Gilmere go out to his truck to get the cocaine. There the arrest would be made, rather than in the crowded restaurant.

The precise sequence of events which thereafter transpired is not explicitly clear from the record, but at least this much is clear. Gilmere was arrested in the vicinity of his truck, perhaps no more than two or three feet away, but before he had actually gotten into the vehicle. Agents Durel, Chapman, and Von Yarn made the arrest. After patting Gilmere down for weapons, the agents obtained the keys to his truck. Chapman opened the vehicle and Williams entered it, immediately locating a red Scrabble box under the passenger seat. The box was taped shut, but the agents opened it on the spot, discovering a clear plastic bag which contained a white powdery substance later determined to be cocaine. The agents had not attempted to secure a search warrant, nor did they obtain Gilmere's consent to search the truck (although there was some testimony that Gilmere had "volunteered" his keys), nor did they announce that the vehicle was being seized pursuant to statutory authorization, nor did they conduct anything resembling an inventory search. The agents did, however, advise Gilmere of his *Miranda* rights.

### The Search of the Automobile

In its appeal, the United States offers two alternative theories to justify the search of Gilmere's truck. The first theory, squarely presented to this Court apparently

for the first time,[1] relies on the authority of the federal forfeiture statutes, 21 U.S.C., § 881[2] and 49 U.S.C., §§ 781, 782.[3] Second, the government argues that, even if these statutes did not authorize the search, the

---

**1.** The seizure and subsequent search of an automobile for contraband under the authority of 49 U.S.C., § 782 was presented to the court in *Maltos-Roque v. United States*, 5 Cir., 1967, 381 F.2d 130, but the court's opinion clearly rested on a finding that both probable cause and exigent circumstances for not obtaining a warrant existed. In *United States v. Pruett*, 5 Cir., 1977, 551 F.2d 1365, *rehearing denied* 569 F.2d 427, the issue was not squarely presented to the panel until the United States raised it in its petition for rehearing. Two members of the panel voted to adhere to the earlier opinion, but one member of the panel was moved by the government's argument. *See United States v. Pruett*, 5 Cir., 1978, 569 F.2d 427 (Hill, J., dissenting).

In its brief, the government vigorously urges this Court to follow the lead of several other circuits and hold that government agents with probable cause to believe that a vehicle has been or is being used to transport contraband may summarily seize and search that vehicle under the forfeiture statutes. The Second Circuit apparently has been the leader in this field and has repeatedly reaffirmed the alternative holding of *United States v. Francolino*, 2 Cir., 1966, 367 F.2d 1013, *cert. denied*, 386 U.S. 960, 87 S.Ct. 1020, 18 L.Ed.2d 110 (1967), that the forfeiture statutes, when coupled with probable cause, do give agents the authority to seize and search vehicles. *See, e. g., United States v. Zaicek*, 2 Cir., 1975, 519 F.2d 412; *United States v. LaVecchia*, 2 Cir., 1975, 513 F.2d 1210; *United States v. Capra*, 2 Cir., 1974, 501 F.2d 267, *cert. denied*, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975); *United States v. Ortega*, 2 Cir., 1972, 471 F.2d 1350, *cert. denied*, 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973); and *United States v. Ayers*, 2 Cir., 1970, 426 F.2d 524, *cert. denied*, 400 U.S. 842, 91 S.Ct. 85, 27 L.Ed.2d 78 (1970).

Other circuits have reached much the same conclusion. *See, e. g., United States v. Troiano*, 3 Cir., 1966, 365 F.2d 416, *cert. denied*, 385 U.S. 958, 87 S.Ct. 396, 17 L.Ed.2d 303 (1966); *United States v. Trotta*, 4 Cir., 1968, 401 F.2d 514, *cert. denied sub nom., Genovese v. United States*, 394 U.S. 908, 89 S.Ct. 1019, 22 L.Ed.2d 219 (1969); *United States v. White*, 6 Cir., 1973, 488 F.2d 563; *United States v. Weatherford*, 7 Cir., 1972, 471 F.2d 47, *cert. denied*, 411 U.S. 972, 93 S.Ct. 2144, 36 L.Ed.2d 695 (1973); *Merrill v. United States*, 7 Cir., 1972, 463 F.2d 521; *United States v. Young*, 8 Cir., 1972, 456 F.2d 872; *Drummond v. United States*, 8 Cir., 1965, 350 F.2d 983, *cert. denied sub nom., Cas-*

*taldi v. United States*, 384 U.S. 944, 86 S.Ct. 1469, 16 L.Ed.2d 542 (1966); *United States v. Stout*, 10 Cir., 1970, 434 F.2d 1264; *Sirimarco v. United States*, 10 Cir., 1963, 315 F.2d 699, *cert. denied*, 374 U.S. 807, 83 S.Ct. 1696, 10 L.Ed.2d 1032 (1963). The Ninth Circuit until recently had produced similar holdings, but in *United States v. McCormick*, 9 Cir., 1974, 502 F.2d 281, the court concluded that recent Supreme Court decisions required it to reverse its previous position. Accordingly, the court held that warrantless seizures of automobiles are permissible when the officer has probable cause to believe that the automobile contains contraband and there are exigent circumstances associated with the automobile, 502 F.2d at 287. *See, also, United States v. Karp*, 9 Cir., 1974, 508 F.2d 1122, *cert. denied*, 422 U.S. 1007, 95 S.Ct. 2628, 45 L.Ed.2d 669 (1975).

**2.** 21 U.S.C., § 881 was enacted in 1970 as part of the Controlled Substance Act, 84 Stat. 1242, which was in turn a part of the Comprehensive Drug Abuse and Control Act of 1970. In pertinent part, § 881(a) provides:

The following shall be subject to forfeiture to the United States and no property right shall exist in them:

(1) All controlled substances which have been manufactured, distributed, dispensed, or acquired in violation of this subchapter.

\* \* \* \* \* \*

(4) All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph (1) or (2),

\* \* \* \* \* \*

Subsection (b)(4) goes on to authorize the seizure of any such vehicles when "the Attorney General has probable cause to believe that the property has been used or is intended to be used in violation of this subchapter". 21 U.S.C., § 881(b)(4). We need not decide whether § 881 impliedly waived the warrant requirement in the face of 21 U.S.C., § 879, which contains a description of the content, service, and execution of search warrants relating to offenses involving controlled substances. It should be noted that the Attorney General has authorized Special Agents of the Drug Enforcement Administration to make such seizures, 21 C.F.R., § 1316.72.

**3.** 49 U.S.C., § 781(a) provides in pertinent part:

DEA agents had sufficient probable cause to make the search without obtaining a warrant, given the exigent circumstances of the situation.

■ Since the agents had unimpeachable grounds for arresting Gilmere for the possession of the cocaine already delivered to Williams and since we believe the subsequent search of the truck and seizure of the reddish box containing cocaine was effected on probable cause and in exigent circumstances at a time when Gilmere was proceeding with no expectation of privacy in the contents of the box, we need not reach or evaluate the government's *forfeiture* argument.

Generally speaking, searches conducted without the prior approval of a judge or magistrate must be justified under one of the "specifically established and well-delineated exceptions" to the warrant requirement. *See Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971). Among those exceptions, as the *Coolidge* Court itself recognized, *id.* at 458–64, 91 S.Ct. 2022, is what is commonly denominated as the "automobile" exception and which had its genesis in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In *Carroll*, a provision of the National Prohibition Act, 41 Stat. 305, 315 (1919), authorized officers who discovered persons engaged in the *transportation* of illegal alcohol to seize the liquor, take possession of the vehicle and arrest any person in charge. Another provision required a warrant to authorize a search for liquor in "private dwellings". In a lengthy opinion, Mr. Chief Justice Taft traced the history of similar statutes from the days of the First Congress, noting that there were well established differences "be-

tween goods subject to forfeiture, when concealed in a dwelling house or similar place, and like goods in course of transportation and concealed in a movable vessel where they readily could be put out of the reach of a search warrant", 267 U.S. at 151, 45 S.Ct. at 284.

In the critical portion of the *Carroll* opinion Mr. Chief Justice Taft declared that:

> On reason and authority the true rule is that if the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid. 267 U.S. at 149, 45 S.Ct. at 283.

The potential reach of this broad statement has, from the beginning, produced extensive differences of opinion among commentators and lower courts, but subsequent Supreme Court opinions have substantially settled the law on automobile searches.

In *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the Supreme Court held that as to automobile searches on probable cause there is no difference under the Fourth Amendment between seizing and holding a car before presenting the issue of probable cause to a magistrate and carrying out an immediate warrantless search. In *Chambers* the car was driven to the police station after the arrest. A search conducted at that place unearthed the evidence which the defendants sought to suppress. The Court found that there was probable cause to make the arrest and reaffirmed that the right to

It shall be unlawful (1) to transport, carry, or convey any contraband article in, upon, or by means of any vessel, vehicle, or aircraft; (2) to conceal or possess any contraband article in or upon any vessel, vehicle, or aircraft, or upon the person of anyone in or upon any vessel, vehicle, or aircraft;

Subsection (b)(1) defines the term "contraband article" to include:

Any narcotic drug which has been or is possessed with intent to sell or offer for sale in

violation of any laws or regulations of the United States dealing therewith; or which has been acquired or is possessed, sold, transferred, or offered for sale, in violation of any laws of the United States dealing therewith;

49 U.S.C., § 782 authorizes the seizure and forfeiture of any vehicle which has been or is being used in violation of any provisions of § 781.

search the automobile and the validity of the seizure did not depend on the right to arrest but, instead, depended on the reasonable cause the seizing officer had for the belief that the contents of the automobile offended against the law, 399 U.S. at 49, 90 S.Ct. 1975. Since the Chambers automobile, when stopped, could have been search on the spot, the subsequent search at the stationhouse was not constitutionally invalid. It was pointed out, of course, that an arrest and the seizure of an automobile without a warrant may not be made in the absence of exigent circumstances.

In *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974) (plurality opinion) discussing *Chambers v. Maroney, supra*, the Court again pointed out that the underlying factor in the *Carroll-Chambers* line of decisions has been the exigent circumstances that exist in connection with movable vehicles. The Court went on to say that "what a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection", citing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973).

It concluded with the significant principle: "but insofar as Fourth Amendment protection extends to a motor vehicle, it is the right to privacy that is the touchstone of our inquiry".

Finally, the Court said that "the fact that the car in *Chambers* was seized after being stopped on a highway, whereas Lewis' car was seized from a public parking lot, has little, if any, legal significance" (footnote omitted).

In *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), the Court reaffirmed the holding of its earlier cases that automobile searches are at least a partial exception to the warrant requirement because "for the purposes of the Fourth Amendment there is a constitutional difference between houses and cars", 413 U.S. at 439, 93 S.Ct. at 2527 (quoting *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419). This constitutional difference, according to the Court, "stems both from the ambulatory character of the latter and from the fact that extensive, and often noncriminal contact with automobiles will bring local officials in 'plain view' of evidence, fruits, or instrumentalities of a crime, or contraband", 413 U.S. at 442, 93 S.Ct. at 2528.

■ It thus seems clear that a warrantless automobile search is constitutional if the officers, acting as a result of their combined knowledge, have probable cause to make the search and if exigent circumstances justify the failure to secure a warrant. The ultimate test is that the search must be reasonable under the circumstances, as viewed objectively.

This Circuit has consistently upheld warrantless automobile searches where both probable cause and exigent circumstances were present.[4]

---

4. *See, e. g., United States v. Edwards*, 5 Cir., 1978, 577 F.2d 883, at 895 (1978); *United States v. Clark*, 5 Cir., 1977, 559 F.2d 420; *United States v. Tuley*, 5 Cir., 1977, 546 F.2d 1264; *United States v. Mitchell*, 5 Cir., 1976, 538 F.2d 1230, *cert. denied*, 430 U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792 (1977); *United States v. Urdiales*, 5 Cir., 1975, 523 F.2d 1245, *cert. denied*, 426 U.S. 920, 96 S.Ct. 2625, 49 L.Ed.2d 373 (1976); *United States v. Nieto*, 5 Cir., 1975, 510 F.2d 1118, *cert. denied*, 423 U.S. 854, 96 S.Ct. 101, 46 L.Ed.2d 78 (1975); *Carlton v. Estelle*, 5 Cir., 1973, 480 F.2d 759, *cert. denied*, 414 U.S. 1043, 94 S.Ct. 546, 38 L.Ed.2d 334 (1973); *United States v. Chapman*, 5 Cir., 1973, 474 F.2d 300, *cert. denied*, 414 U.S. 835, 94 S.Ct. 179, 38 L.Ed.2d 71 (1973); *United States v. Ragsdale*, 5 Cir., 1972, 470 F.2d 24; *United States v. Gulledge*, 5 Cir., 1972, 469 F.2d 713; *United States v. Edwards*, 5 Cir., 1971, 441 F.2d 749.

To be sure, there is language in some of our cases which, if read literally, would indicate that only probable cause is necessary to authorize a warrantless search of an automobile. *See, e. g., United States v. Morris*, 5 Cir., 1978, 565 F.2d 951; *United States v. Pruett*, 5 Cir., 1977, 551 F.2d 1365; *United States v. Rodriguez*, 5 Cir., 1975, 523 F.2d 738; *United States v. Ramirez*, 5 Cir., 1975, 506 F.2d 742; *United States v. Weaver*, 5 Cir., 1973, 471 F.2d 18; *United States v. Blackwell*, 5 Cir., 1970, 430 F.2d 1270. However, our examination of the mostly brief opinions in those cases where the searches were upheld against constitutional at-

On numerous occasions the Supreme Court has emphasized that the automobile exception does not give law enforcement officers a hunting license, or a roving warrant to search vehicles indiscriminately. *See, e. g., South Dakota v. Opperman,* 428 U.S. 364, 380, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Chambers v. Maroney,* 399 U.S. 42, 50, 90 S.Ct. 1975, 26 L.Ed.2d 419.

Did probable cause and exigent circumstances justify the search of Gilmere's truck?

In the first place, there can be no doubt, and indeed the parties do not here controvert the fact, that the DEA agents had every reason to believe that the truck contained cocaine. Gilmere had made special arrangements with Williams to sell the latter a pound of cocaine, and to possibly sell him as much as ten pounds. After that first meeting, he drove away, stopped to make a phone call, and then stopped at a restaurant where he had a conversation with another man. Both of them then left and were followed. The two entered an apartment, and immediately the blinds were closed. Under the surveillance of the DEA agents, Gilmere left, carrying a reddish box under his arm. Gilmere was trailed, and there is no indication in the record that he ever had an opportunity to dispose, or did dispose, of the reddish box. He kept his appointment with Williams, who engaged him in further conversation about the cocaine (although the substance of that conversation is somewhat controverted). Gilmere offered Williams an envelope, which he said contained a sample of the cocaine, *the remainder of which he said was outside.* Williams went to the men's room and his field test of the sample indicated positive for cocaine. Agent Durel then entered the men's room, and the two agents shared their knowledge of the facts, although Williams had previous knowledge of much of what had transpired due to his monitoring the radio. They agreed that the arrest would be made outside, perhaps to avoid an unseemly incident inside the crowded restaurant. Gilmere apparently did not suspect that Williams was an undercover agent, and he willingly walked outside to his truck, in close proximity to which the arrest was made. Beyond any shadow of a doubt, these agents had all but "certain knowledge" that the truck contained cocaine.

Were sufficiently exigent circumstances present? There is no doubt that if the agents had permitted Gilmere to retrieve the cocaine from the truck and then arrested him while in the act of completing the transaction with Williams, the cocaine in the reddish box would have been readily admissible in evidence. However, had they permitted him to enter the truck, he could have spotted the other agents and suspected that his project had gone sour. He could then have fled the scene, forcing the officers to give chase or to permit him to escape, along with the contraband in the vehicle. Had the officers waited until a chase actually took place the subject might nevertheless have escaped, as often happens. Certainly, if a chase had ended successfully the officers would have had the right to arrest him, with an immediate search of the vehicle, *Carroll v. United States, supra.* Under the facts of this case, the officers were under no constitutionally imposed compulsion to wait any longer. Probable cause and exigent circumstances had met; it remained only for the officers to act.

That the truck door was locked, that several agents were present, and that the subject could have been immobilized pending the application for and the receipt of a search warrant does not dictate any different result. In so many words, Gilmere had already published the presence of the cocaine in the vehicle. It was held in *Cardwell v. Lewis, supra,* that there is little, if any, legal difference between stopping the car on the highway and seizing it from a

tack convinces us that there were sufficient exigent circumstances present in each case to justify the result. Such factors as moving automobiles, opportunities for destruction of the evidence, or the abandonment of vehicles in public areas may, in the facts and circumstances of a particular case, present sufficient exigency to dispense with a warrant.

public parking lot, the necessary prerequisites being present. Gilmere did not have to be physically in the truck or attempting to drive it away. His truck was there, he was there, and the contraband most assuredly was in it.

Moreover, as we stated in *United States v. Mitchell*, 5 Cir., 1976, 538 F.2d 1230, 1233 (en banc), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792 (1977):

> Nor do we think the matter affected by the presence around the parking lot of ten or more surveilling agents rather than one or two. We have never before tested mobility of automobiles or exigence of circumstances by evaluating police capability to respond or the balance of forces deployed. Once commenced, the end of such a calculus would be evaluation of the opposing armaments and of the relative top speeds of the vehicles. We decline to embark on it.

*See, also, South Dakota v. Opperman*, *supra*, 428 U.S. at 379, 96 S.Ct. 3092 (Powell, J., concurring).

In 1973, in *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706, the defendant had been injured in an automobile accident; he identified himself as an off duty policeman; and the law enforcement officers had reason to believe that his service revolver might be in his disabled car. At page 447, 93 S.Ct. 2523, the Supreme Court appears to have approved the action of the law enforcement officer in going into the vehicle in order to locate and immobilize a service revolver to protect the public against the chance that an intruder might come across that dangerous weapon and cause injury to the public. In our case, these officers had overwhelming reason to believe (almost to the point of knowledge) that this vehicle contained a pound of cocaine. A pound of cocaine poses more danger to the community, if retrieved by a vandal, than a service revolver. It seems to us that the law enforcement officer would have been under heavy duty to see to it that he was not leaving a vehicle in that parking lot containing a pound of dangerous drugs while he was in attendance upon a Magistrate somewhere trying to get a warrant authorizing him to find and remove it.

As to the Fourth Amendment we are driven to the conclusion that this was an automobile search, grounded on probable cause and justified by exigent circumstances.

### Does *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538, Mandate a Different Result?

For several reasons we feel that this question must be answered in the negative.

In the first place, *Chadwick* was not an automobile search, 433 U.S. at 11, 97 S.Ct. 2476. Secondly, there were no exigent circumstances. On the other hand, we see nothing in *Chadwick* which could reasonably be construed as a limitation upon warrantless searches of automobiles and effects found therein if the search is prompted by probable cause and accomplished in the face of exigent circumstances. If, as held in *Chambers v. Maroney*, *supra*, there is no material difference between seizing and holding a car and searching that car, then if the officers have good cause to immobilize a car they have the same reason to search it. Conversely, if the officer has no right to a warrantless search of the vehicle he has no right to immobilize it.

*United States v. Chadwick* reiterated the following principles to be applied to Fourth Amendment cases:

1. The fundamental inquiry is whether a search or seizure is reasonable under the circumstances, remembering that the Amendment protects people, not places;

2. A fundamental purpose of the Amendment is to safeguard individuals from unreasonable government invasion of legitimate privacy interests, although the Supreme Court pointed out [Fn. 6, 433 U.S. 11, 97 S.Ct. 2483] that "[t]his is not to say that the Fourth Amendment translates precisely into a constitutional privacy right";

3. A diminished expectation of privacy surrounds an automobile.

A focal point of *Chadwick* is found in the following language:

By placing personal effects inside a double-locked footlocker, respondents manifested an expectation that the contents would remain free from public examination. No less than one who locks the doors of his home against intruders, one who safeguards his personal possessions in this manner is due the protection of the Fourth Amendment Warrant Clause. 433 U.S. 11, 97 S.Ct. 2483.

The evidence in our case, however, points overwhelmingly to the fact that Gilmere had no expectation of privacy in the contents of the reddish box. To the contrary, his undoubted purpose was to display the box and its contents to the agents. Indeed, he intended to deliver the box and contents to the agents if paid the demanded price. He had already told the agents that the cocaine was "outside", which pointed inexorably to the fact that the cocaine was in some kind of container in the truck. The *Chadwick* defendants had no prior contact or commerce with the arresting officers; whereas, Gilmere had verbally exposed the location and existence of both box and contents.

To sum up, we are of the opinion that the search of Gilmere's truck and the seizure of the reddish box were supported by probable cause and the existence of exigent circumstances. Moreover, we are of the opinion that Gilmere had no expectation of privacy in the reddish box and its contents.

### III

### *Gaultney's Appeal*

After Gilmere had been arrested, Agents Williams and Durel proceeded to the Moonraker Apartments to join the four agents who had remained on surveillance and to arrest Gaultney. The agents could not see into the apartment and had obtained neither an arrest warrant nor a search warrant. According to their testimony, Durel knocked on the door and loudly announced, "Federal Agents. Open the door. You're under arrest". Williams was simultaneously ringing the door bell and trying the door latch, which proved to be unlocked. The officers entered the apartment with guns drawn and saw a man (later identified as Leslie Hosch) getting up from the couch in front of a window. Because Hosch appeared to be reaching for a gun under the coffee table in front of him, the agents told him not to move. Another individual (later identified as Robert Williams) was seen walking away from a dinette table on which could be seen a large quantity of white powder inside clear plastic bags, a razor blade, and a mirror. A set of triple beam balance scales was on the kitchen counter a few feet away. Gaultney was found in the stairwell of a circular staircase going up to the second floor of the apartment. Agent Williams placed all three men under arrest.[5] After being advised of his *Miranda* rights, Gaultney indicated that he understood those rights and did not wish to waive them. He was then handcuffed and seated on the living room couch. Agent Williams then left the apartment with the cocaine, razor blade and mirror, and returned to the DEA office to process the evidence and obtain a search warrant for the remainder of the apartment.

Hosch and Williams were removed from the apartment shortly after their arrest, which left Gaultney alone with two or three agents. After some thirty to forty-five minutes had elapsed, Gaultney apparently became somewhat agitated and told the agents that since the agents were going to get a search warrant anyway, they might as well go ahead and search the apartment. Durel then instructed another agent to prepare a written consent to search. The written consent, as well as an inventory signed by Gaultney, were both excluded from evidence as a sanction for failure to produce in response to a discovery request and the pretrial order. The evidence as to the oral consent was excluded as a discovery sanction. Gaultney also made several incriminating statements, although he was readvised of his constitutional rights.

---

5. The complaints against Hosch and Williams were dismissed after the preliminary hearing, and they were not indicted with Gilmere and Gaultney.

■ In this context, we are called upon to decide whether the daytime entry without a warrant into Gaultney's apartment violated the Fourth Amendment.

To begin with, we are convinced that the DEA agents acted with more than adequate probable cause to believe (1) that an individual had committed a felony in the apartment within the past few hours, (2) that the offender was still in the apartment, and (3) might still be in the act of committing another felony, to-wit, the possession of ten pounds of cocaine. Gaultney does not claim that there was no probable cause for the arrest.

If the Fourth Amendment was, in fact, violated, all the evidence in plain view and seized by the agents during the arrest must be excluded, encompassing several plastic bags of cocaine and a set of triple beam balance scales.

On at least five occasions, the Supreme Court has reserved, or has declined to decide, whether and under what circumstances a police officer may enter the home of a suspect for the purpose of accomplishing a *warrantless* arrest. *See United States v. Santana*, 427 U.S. 38, 45, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (Marshall, J., dissenting); *United States v. Watson*, 423 U.S. 411, 418 n. 6, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), *id.* (Powell, J., concurring), *id.* at 433, 96 S.Ct. 820 (Stewart, J., concurring); *Gerstein v. Pugh*, 420 U.S. 103, 113 n. 13, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); *Coolidge v. New Hampshire*, 403 U.S. 443, 474–81, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), *id.* at 510–12 and n. 1, 91 S.Ct. 2022 (White, J., dissenting); *Jones v. United States*, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). This is understandable when it is remembered that this situation puts the spotlight simultaneously on the critical need in this Country for the effective suppression of the narcotics traffic, as contrasted

with the honored adage that "a man's home is his castle".

The Supreme Court, however, has not been altogether silent on the subject.

In *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), the officers were on the heels of a fleeing robber who had been seen to take refuge in a house. The officers went in without a warrant and arrested him. The Court stated, rather emphatically we think,

> That neither the entry without warrant to search for the robber, nor the search for him without warrant was invalid. Under the circumstances of this case "the exigencies of the situation made that course imperative". 387 U.S. at 298, 87 S.Ct. at 1645.

The Court continued,

> They acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. *Id.*

In *Hayden*, it will be noted, first, that the officers were acting on what others had told them—not what they themselves had observed. Next, they were in pursuit of a man said to be armed. Nevertheless, it seems clear to us that, most assuredly, the Supreme Court was saying that officers do not always have to have a warrant to enter a house for the arrest of a felon. If they have probable cause to arrest for a felony and the exigencies of the situation make it imperative that they proceed without waiting to obtain a warrant the arrest is not constitutionally invalid. This is certainly the law as it presently exists in the Fifth Circuit. *See United States v. Williams*, 5 Cir., 1978, 573 F.2d 348; *United States v. Hofman*, 5 Cir., 1974, 488 F.2d 287; [6] *United*

---

6. *Hofman* was a counterfeiting case. Three government agents kept a defendant's motel room under surveillance while another agent went through a prearranged buying transaction at a nearby shopping center with a defendant who had brought the money there from the motel. The buying agent arrested the seller and returned to the motel to arrest the others

involved. The surveilling agents had not seen anyone leave but when they entered the motel room it was empty. They found counterfeit money in plain view. In a summary calendar disposition (Judges Bell, Godbold, and Gee), the validity of the entry to make the arrest was upheld.

*States v. Cushnie,* 5 Cir., 1973, 488 F.2d 81, *cert. denied,* 419 U.S. 968, 95 S.Ct. 233, 42 L.Ed.2d 184; *United States v. Morris,* 5 Cir., 1973, 477 F.2d 657.[7] Since *Dorman v. United States,* 1970, 140 U.S.App.D.C. 313, 435 F.2d 385, sustained the validity of a warrantless arrest in a defendant's home at night, accomplished under exigent circumstances, we do not regard it as being authority to the contrary.

The entry into the house was accomplished during daylight and without the exercise of force. The issue is reduced to whether the exigencies of the situation made it imperative that the officers enter the house and arrest Gaultney without first securing an arrest warrant. By definition, "imperative" means "absolutely necessary", "urgent", or "compelling".

The officers had good reason to believe that as much as ten pounds of cocaine was in the house. They saw, too, that considerations of privacy ordinarily attributable to a home were present in only minimal form. Gilmere had visited the house and quickly left with a package which he had not carried there. A woman soon left. Two men drove up in another vehicle and entered. The place was a beehive of activity, involving a comparatively large number of people who did not appear to be members of the family group. The officers could reasonably infer that those within the house were momentarily expecting the return of Gilmere, with $20,000 from the intended transaction at the restaurant; his failure to return would likely raise flags for people

immersed in so dangerous an activity as the cocaine traffic.

While *Warden v. Hayden* spoke of the necessity for securing the gun used in the bank robbery and of the danger such a weapon would pose for the officers, it cannot be overlooked that presumably the officers would have been in no danger from the gun had they made no effort to enter the house and make the arrest. We think that the controlling factor in *Hayden* was that the officers were confronted with an inherently dangerous situation.

This, too, was a "hot pursuit" case in that once Gilmere was arrested at the restaurant parking lot the officers knew that they had just completed running the tiger to his lair, that they had him standing at bay, and that once he suspected the presence of the huntsman the very least he would likely do would be to attempt an escape, along with the cocaine. That the officers were outside the house was no guarantee that the escape of man and contraband could not take place, *see United States v. Hofman* [Footnote 6], in which the men escaped unseen from a motel room which the officers had under surveillance. It can hardly be said that the officers could be confident that with such a large amount of cocaine inside the house the occupants would not, for lack of other alternatives, try to shoot their way out. *Realistically,* the officers had found themselves on top of a "powder keg". Under these circumstances, we do not feel that the Fourth Amendment required them to stand paralyzed while someone went to

7. Whatever the constitutional limitations on the ability of government agents to enter an individual's dwelling place in order to arrest him without a warrant, it is crystal clear that, in the absence of extenuating circumstances, agents must comply with the requirements of 18 U.S.C., § 3109 before they may enter to effect the arrest, *Sabbath v. United States,* 391 U.S. 585, 588, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968). The named statute provides: "[t]he officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance . .". The statute applies to warrantless entries for the purpose of making an arrest, even though it refers only to the execution of search warrants, *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). The burden of establishing a prima facie case that the statute was violated rests with the defendant, *United States v. Gardner,* 5 Cir., 1977, 553 F.2d 946, 949, *cert. denied* 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978). Although there was conflicting testimony below and no express finding of fact on this point, the magistrate apparently resolved this issue against the defendant. Our examination of the record leads us to the same conclusion—that the agents did in fact comply with the demands of the statute.

draft the necessary affidavit, locate a magistrate, present the matter, draft the warrant, get it signed, and regain the scene.

This was a situation which compelled the officers to move quickly, firmly, and effectively. We hold, therefore, that the entry of the house and the subsequent arrest of Gaultney met the constitutional requirements of reasonableness.[8]

In view of our resolution of the suppression issue, we need not reach, and do not decide, whether one who has given probable cause for his arrest for a felony is entitled thereafter to an expectation of privacy merely because he is within his own house.

The judgment of the District Court, suppressing the evidence in this case, is reversed. The case is remanded for further proceedings not inconsistent herewith.

REVERSED and REMANDED.

GEE, Circuit Judge, specially concurring:

I concur in the result and in most of the reasoning of the thorough majority opinion. I am unable to agree, however, that since the Supreme Court's decision in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the rule remains that all warrantless automobile searches require both probable cause and exigent circumstances;[1] I think that probable cause now suffices standing alone.

As we recently held in *United States v. McLaughlin*, 578 F.2d 1180, at 1183 (5th Cir. 1978):

The remaining question is whether customs officials violated the fourth amendment in searching the vehicle without first obtaining a warrant. We think that they did not for two reasons. First is the exigent circumstance that McLaughlin and his passenger might have returned to remove or destroy the contraband. *See Coolidge v. New Hampshire*, 403 U.S. 443, 462, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Any officers standing watch over the car while a warrant was being obtained would have been particularly vulnerable given the time of night and the suspects' ability to use the Garcia house as cover. Even if these circumstances were not sufficiently exigent, however, we would still uphold the search on the strength of the Supreme Court's language in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). In that case the Court observed that it had previously sanctioned warrantless auto searches in the absence of any exigencies created by the mobility or vulnerability of the searched vehicle. 97 S.Ct. at 2484. *Accord Cady v. Dombrowski*, 413 U.S. 433, 441–42, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). *See South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). The justification for those searches was, instead, the "dimin-

---

8. As indicated earlier, sometime after the arrests Gaultney became agitated and told the agents that since they were going to get a search warrant anyway they might as well search the apartment at that time. The agents then prepared a written consent, which Gaultney allegedly signed. The subsequent search turned up more incriminating evidence, which was also excluded by the Magistrate and the District Judge, citing *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); and *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1962). The Magistrate therefore did not make a finding of fact on the issue of Gaultney's consent, nor did he decide Gaultney's charges of governmental misconduct. In the present posture of this case, where there are no findings of fact on

these issues and the parties have neither briefed nor argued them, we expressly do not decide them. We note, however, that the mere threat to obtain a search warrant does not amount to coercion. *United States v. Gardner*, 5 Cir., 1977, 553 F.2d 946, 949.

Moreover, the defendants now have had notice for a long time of the existence of the signed consent and are in position to defend their objections to it. Before this case goes to trial, if it does go to trial, the District Court, in the interests of justice, should reopen the record and hold a plenary hearing, with adequate findings, on the matters hitherto excluded by way of sanctions.

1. See text of majority opinion at note 4, *supra*.

ished expectation of privacy which surrounds the automobile." *United States v. Chadwick*, 97 S.Ct. at 2484. As the Court noted, automobiles seldom serve as repositories of personal effects; they travel public thoroughfares where both occupants and contents are in plain view and are themselves subject to extensive government regulation. 97 S.Ct. at 2484. *Accord South Dakota v. Opperman*, 428 U.S. at 367–68, 96 S.Ct. 3092.

We take the Court's analysis in *Chadwick* to mean that warrantless searches are the general rule. This much seems clear since in that case the Court justified its holding, that luggage is immune from warrantless searches absent exigent circumstances, by distinguishing the privacy interest in luggage and similar items from that in automobiles.[2] Of course, it

[2] By contrast, in *Coolidge v. New Hampshire*, which greatly emphasized the need for exigent circumstances in warrantless auto searches, the Court stated that if cars could be searched without warrants and in the absence of exigent circumstances, so could luggage. 403 U.S. at 461 n. 18, 91 S.Ct. 2022.

still may not be true that "in every conceivable circumstance the search of an auto even with probable cause may be made without the extra protection for privacy that a warrant affords," *Chambers v. Maroney*, 399 U.S. at 50, 90 S.Ct. 1981, but we find nothing exceptional about the search in this case.

Since I find nothing exceptional about the search in this case either, I would apply the general rule of *Chadwick*, grounded in the diminished expectation of privacy which attends automobiles. I would do so in the belief that the Supreme Court has recognized that its recent opinions have attenuated the concept of mobility as a basis for exigence in automobile searches to such a degree that it has become almost a fictional concept, a sort of "mobility-in-law." So recognizing, with *Chadwick* it shifted the analysis to the sounder basis of diminished expectation of privacy, and I think we should recognize this.