**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Joanne MARSZALKOWSKI and Loran Bennett, Defendants-Appellants.**

**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Jack BROCK, Defendant-Appellee.**

Nos. 80–5597, 80–5621.

United States Court of Appeals,
Eleventh Circuit.

March 1, 1982.

A. Scott Miller, Asst. U. S. Atty., Linda Collins-Hertz, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellant.

Theodore Klein, Joseph H. Serota, Miami, Fla., for defendant-appellee.

Denis Dean, Dean & Hartman, P.A., Miami, Fla., for Marszalkowski.

Stephen H. Rosen, Thomas G. Murray, Miami, Fla., for Bennett.

Before RONEY and FAY, Circuit Judges, and EDENFIELD *, District Judge.

FAY, Circuit Judge:

This opinion resolves two separate appeals involving a single group of defendants. In November of 1979, an undercover operation undertaken by the Drug Enforcement Administration [DEA] led to the arrests of five individuals, Loran Bennett, Stanford Mitchell, Jack Brock, Joanne Marszalkowski and Jorge Congote, on drug-related charges. Brock, who obtained a severance from his four co-defendants, con-

vinced the trial judge that his arrest was illegal. The government presently appeals this ruling, along with the trial judge's concomitant suppression of evidence found in the initial search following the arrest. Our examination of the law prevailing in this circuit at the time of the incident in question leads us to reject the trial judge's assessment. We therefore find for the appellant, the United States of America, holding that evidence obtained during the initial search should not have been excluded.

In their separate appeal, convicted co-defendants Bennett and Marszalkowski present a laundry list of grounds for reversal. Neither, alas, has succeeded in cleansing on appeal what was found to be simply dirty linen at trial. We therefore affirm their convictions. Through the analysis that follows, we hope to iron out the legal creases in their argument. Here, first, are the steamy facts:

I.

On November 6, 1979, Alfred Moscowitz, a government informant, disclosed to DEA agents that Loran Bennett was known to him as a trafficker in "large quantities of cocaine." R. Vol. VIII at 128. At the agents' request, Moscowitz phoned Bennett and told him that he was in contact with prospective purchasers of cocaine. The following day, Moscowitz escorted DEA Agents Brown and Thompson to Bennett's place of business in Hialeah. Posing as traffickers in narcotics, the agents told Bennett they wished to buy "large quantities of cocaine." Bennett disclosed that he had an unlimited supply, available at a price of $54,000.00 per kilo.[1] He assured the agents that he could supply them with four to five kilos monthly. He agreed to deliver one kilo the following day, and three additional kilos shortly thereafter. Bennett stated that "he and his people" had previously dealt in rock cocaine but had begun

---

* The Honorable Newell Edenfield, United States District Judge for the Northern District of Georgia, sitting by designation. This case is being decided by a quorum due to the death of Judge Edenfield on December 27, 1981. 28 U.S.C. Section 46(d).

1. A kilo is equivalent to approximately 2.2 pounds. R. Vol. VIII at 52.

dealing in flaked cocaine, a purer form of the drug, which he found to be a "better commodity." The cocaine, he informed them, would be packaged in the shape of a football.

On November 8, the parties exchanged four telephone calls, during which Bennett disclosed that he had been successful in making contact with "his people." A major portion of the last telephone conversation, which occurred at 8:30 p. m. that day, was tape recorded; in it, Bennett assured the agents that all was ready as planned. Final arrangements were made to meet Bennett at the Ramada Inn, located at Milam Dairy Road and 72nd Avenue in Miami, for the delivery.

At 9:30 p. m., Bennett was observed driving his station wagon into the Ramada Inn parking lot accompanied by an individual later identified as Stanford Mitchell. Bennett parked the car, exited it and approached Agents Brown and Thompson, who were standing near the front entrance of the motel. After escorting Bennett to their car, the agents showed him $58,000.00 in cash. The three men returned to Bennett's vehicle; Mitchell remained in the front seat. Bennett reached into the station wagon and retrieved a brown paper bag from a box on the car's back seat. Inside the paper bag was a football-shaped package, wrapped in masking tape. It contained a white powder determined subsequently to contain 984 grams of 48% pure cocaine. As the four men walked back to the agent's car, Brown and Thompson identified themselves. They immediately arrested Bennett and Mitchell. Bennett was found to have an automatic pistol with a holster and slip, together with rounds of ammunition in the waistband of his trousers; Mitchell was carrying a revolver. In addition, Bennett had $1500.00 in his pocket which he stated his supplier had given him to use to find girls and to bring them back to the supplier's apartment for a party that night.

Bennett and Mitchell were then taken to the DEA office in Miami, where Bennett agreed to call his source of supply, whom he identified as Jack Brock. During their conversation, Bennett assured Brock that all had gone well "on the first one" and that the customers were ready for "three more tomorrow." Brock said that he would try to obtain the additional three kilos of cocaine. He asked Bennett to keep the buyers in town and to come over to Brock's apartment for the party. After the phone call, Bennett led the agents to the area of an apartment in Hileah where Brock had delivered cocaine to him. He pointed out the apartment, from the outside, provided a physical description of Brock, and disclosed that a woman had been present in the apartment at the time Bennett received the drugs there. DEA agents were dispatched to maintain surveillance of the apartment. They observed two men entering and leaving the apartment carrying bags. After agents knocked at the apartment's front entrance, Brock responded, unexpectedly, by opening the kitchen door. As Brock stuck his head and torso out of the apartment, Agent Walde, who had been leaning against the kitchen entrance, fell in. The other agents followed him inside and revealed their identities. Having concluded that he fit Bennett's description of his supplier, they asked Brock to identify himself. He complied and was arrested at once. From the kitchen, the agents were able to observe resting on a coffee table in the living room area the residue of a white powder; a mirror on which was a formula for cocaine; various cutting instruments; and cash. Joanne Marszalkowski, who was found standing in the kitchen or hallway area, was immediately arrested. A protective sweep was then conducted to look for other persons, as a result of which a handgun; scale; vial of cocaine; and a plastic bag containing white powder were found in plain view. Two agents remained inside to secure the apartment, while the others left to procure a search warrant. A search warrant was obtained and executed fifteen hours later; the latter search yielded additional cocaine, methaqualone tablets and $10,500.00 in cash from a tall dresser in the bedroom containing women's clothing; a substance used to cut cocaine; and a .38

Smith & Wesson revolver along with additional cocaine from a nighttable next to the bed.

In June of 1980, a grand jury returned a six-count indictment charging Bennett, Mitchell, Brock, Marszalkowski and Congote with conspiracy to distribute cocaine (Count I); Bennett and Mitchell with possession of cocaine (Count II); Brock and Marszalkowski with distribution of cocaine (Count III) as well as with possession with intent to distribute cocaine and methaqualone tablets (Count IV); and Bennett and Brock with use of a communication facility to further a felony (Counts V and VI). Congote was severed and convicted; his conviction was affirmed in *United States v. Congote*, 656 F.2d 971 (5th Cir. 1981). Bennett's motion for severance was denied; he presently appeals the denial. During trial, the judge granted Brock's motion for severance as well as Marszalkowski's and Brock's motion to suppress evidence obtained following the initial entry of the apartment; however, he denied suppression of those items found during the subsequent search conducted pursuant to warrant. Mistrials were declared as to all counts against Mitchell and the conspiracy charge against Marszalkowski, after the jury was unable to reach verdicts regarding them.

## II. Bennett's Challenge

### A. *Severance*

Bennett complains that he was misjoined with his co-indictees on dual grounds: first, the charge of conspiracy in Count One was multiplicitous and second, once the conspiracy charges against Mitchell and Marszalkowski were dismissed, his severance was mandatory.

■ Federal Rule of Criminal Procedure 8(b) permits joinder of defendants in a single indictment where they are alleged to have participated in the same transaction or series of transactions.[2] For purposes of ap-

pellate review, the facts recited in an indictment are deemed true unless joinder is based on prosecutorial bad faith or improper legal interpretation. *See United States v. Levine*, 546 F.2d 658, 663 (5th Cir. 1977); *United States v. Nims*, 524 F.2d 123, 126 (5th Cir.), *cert. denied*, 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976).

While making no allegation of bad faith, Bennett does contend that the indictment improperly charged multiple conspiracies. Bennett likens his indictment to that in *United States v. Whitehead*, 539 F.2d 1023 (4th Cir. 1976), where the lone facts that the co-defendants Whitehead and Meredith lived in the same building and sold cocaine to the same buyer were insufficient grounds to support their joint indictment for distribution of the controlled substance. Although the two drug deals in *Whitehead* possessed the "common denominator" of defendant Jackson, who bought drugs from Whitehead in one deal and from Meredith in another, *id.* at 1025, no conspiracy was charged nor was any relationship whatsoever between Jackson and Meredith ever alleged. 539 F.2d at 1024, n.1. Under those circumstances, their separate, unrelated sales of cocaine could not possibly have formed part of the same transaction or series of transactions. Joinder, therefore, was impermissible, "[s]ince the alleged criminal acts of Whitehead and Meredith were independent crimes, engaged in separately, without concert of purpose." 539 F.2d at 1023.

■■ By contrast, evidence of Bennett's participation in a conspiracy reflects a common scheme supporting joinder. Bennett nevertheless protests that when he purchased cocaine from Brock at the apartment rented by Marzalkowski, the latter remained in the kitchen and that therefore, if anything, multiple unrelated conspiracies existed. A single conspiracy, however, may

---

2. The complete text of Fed.R.Cr.P. 8(b) is as follows:

 (b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transac-

tion or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

exist even if not all conspirators take part in all aspects of the scheme. *See United States v. Ochoa*, 609 F.2d 198, 202 (5th Cir. 1980); *United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir. 1980) (*en banc*), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981). Certainly the introduction of evidence including Marszalkowski's presence in the apartment at the time Bennett purchased cocaine there from Brock; the rental of the apartment in her name; and the presence of drugs in what clearly was her dresser, by virtue of its containing women's clothing, provide the requisite connection between herself and Bennett. Accordingly, we find no merit in the appellant's claim of misjoinder on the ground of multiple conspiracies.

 Moreover, the mere fact that a mistrial on the conspiracy charge was declared as to Marszalkowski does not detract from the legal adequacy of the conspiracy count. The general rule is that even acquittal of conspiracy does not of itself establish misjoinder. *Schaffer v. United States*, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); *Cacy v. United States*, 298 F.2d 227, 228–29 (9th Cir. 1961). Bennett's second claim, then, of retroactive misjoinder, which asserts that the dismissal of the conspiracy charge against Marszalkowski requires a finding of misjoinder, is similarly misplaced.

Bennett further contests the trial judge's denial of his motion for severance of his trial from co-defendant Marszalkowski on the grounds that the admission of certain evidence, consisting of narcotics, against Marszalkowski was prejudicial as to him.

 Our analysis of this claim must begin with the accepted principle that defendants jointly indicted should be so tried. *United States v. Sullivan*, 578 F.2d 121, 123 (5th Cir. 1978). An exception to this rule may be enforced where such joinder would cause the defendant undue prejudice. F.R.

Cr.P. 14.[3] In determining a motion for severance brought on such grounds, the trial judge is empowered to exercise sound discretion in balancing possible prejudice to the defendant against governmental concern for judicial economy. *United States v. Staller*, 616 F.2d 1284, 1294 (5th Cir. 1980). Inherent in every joint trial is, of necessity, some degree of bias. Only in the event such prejudice appears to be *compelling* does severance become warranted. *United States v. Perez*, 489 F.2d 51, 65 (5th Cir. 1973).

 The following test for assessing the existence of "compelling prejudice" has been adopted by this circuit:

'[w]hether under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted.'

*Tillman v. United States*, 406 F.2d 930, 935 (5th Cir. 1969) (*citing Peterson v. United States*, 344 F.2d 419, 422 (5th Cir. 1965)). *See also United States v. Zicree*, 605 F.2d 1381, 1388–89 (5th Cir. 1979).

 Viewed according to the foregoing standard, the trial of Bennett with Marszalkowski was fully proper. Bennett's claim of prejudice is addressed solely to the introduction at his joint trial of evidence consisting of 38 methaqualone tablets and several vials of cocaine, which Marszalkowski had possessed in her apartment. We note, however, that on this evidence, the jury was unable to reach a verdict regarding Marszalkowski's own involvement in a conspiracy; hence a mistrial was declared as to her on

---

**3.** Rule 14 of the Federal Rules of Criminal Procedure provides, in pertinent part, that

[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information

or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires...

this count. Consequently, the court does not accept the appellants' unsubstantiated assertion that what was clearly not prejudicial even to the individual against whom it was introduced—Marszalkowski—could nevertheless have prejudiced Bennett.

Bennett argues additionally that the court erred in failing to caution the jury to consider those items only as against Marszalkowski. However, since it was Marszalkowski alone who was charged as to those particular items, jury confusion does not seem likely. Moreover, at the close of trial, the judge carefully instructed the jury to consider each offense and each defendant separately.[4] We conclude that this explicit caution sufficed to cure any possible confusion or prejudice in the minds of the jurors. *See United States v. Johnston*, 547 F.2d 282 (5th Cir. 1977); *United States v. Davis*, 546 F.2d 617, 620 (5th Cir. 1977).

### B. Sufficiency of Evidence

*Conspiracy*

Bennett argues that declaration of mistrials as to Marszalkowski and Mitchell followed by the government's dismissal of their conspiracy indictment renders insufficient the evidence of his own participation in the alleged conspiracy. The crux of Bennett's claim is that once conspiracy charges against Marszalkowski and Mitchell were dismissed, no more than a single sales transaction was provable. He contends that the remaining evidence of a lone sale to him by Brock simply fails to support an inference of their joint conspiracy. Acknowledging that his co-defendant, Congote, was convicted of conspiracy at a separate trial, Bennett suggests, without foundation, that Congote's conviction related to a separate conspiracy. Bennett fails to recognize, however, the crucial principle that a declaration of mistrial is not equivalent to a factual determination. *United States v.*

*Nelson*, 599 F.2d 714, 716 (5th Cir. 1980); *United States v. Ballard*, 586 F.2d 1060, 1064–66 (5th Cir. 1978). The only prerequisites to a proper finding of the defendant's guilt are proof beyond a reasonable doubt of the conspiracy's existence; Bennett's knowledge of it; and his agreement to become a member. *United States v. Suarez*, 608 F.2d 584, 586 (5th Cir. 1979). We find that the totality of evidence supplies each of these elements of guilt. Bennett's reference to having contacted "his people" in order to supply the agents with cocaine; his accurate description of the cocaine package as football-shaped; his agreement to distribute one kilo of cocaine initially, to be followed by three more; his phone call to Brock, in which he discussed the delivery of three additional kilos and in which Brock indicated his complete familiarity with the proposed transaction, point to his and Brock's "concert of action, all working together with a single design to accomplish a common purpose," *United States v. Villareal*, 565 F.2d 932, 938 (5th Cir. 1978)—the distribution of cocaine for monetary gain. We therefore reject his assertion of insufficiency.

*Facilitation*

Bennett launches a similar attack on the adequacy of the evidence supporting his conviction for use of a telephone to commit a felony. Since one phone call made by Bennett to Brock was initiated at the agents' behest, Bennett contends that it cannot form the basis for the facilitation count. This contention, while accurate, certainly is not dispositive, since it is not upon this particular phone call that the facilitation count is based. Rather, the charge is founded on other phone calls with Agent Brown, *see* R.Vol. VIII at 57; Supp.R. at 152, and with Brock regarding the drug deal, to which Bennett himself testified at

---

**4.** The trial judge cautioned the jury by stating: Now, a separate crime or offense is charged against one or more of the defendants in each count of the indictment. Each offense, and the evidence pertaining to it, should be considered separately. Also the case of each defendant should be considered separately and individually. The fact that you may find one or more of the accused guilty or not guilty of any of the offenses charged should not control your verdict as to any other offense or any other defendant. R.Vol. X at 503.

trial, see R.Vol. IX at 316–320. *United States v. Arias*, 639 F.2d 1183, 1185–6 (5th Cir. 1981).

Accordingly, we find meritless the appellant Bennett's challenge of his conviction for facilitation of a felony.

### III. Marszalkowski's Appeal

*Insufficiency of Evidence*

■ Joanne Marszalkowski likewise argues that insufficient evidence was presented to support the charge against her of possession with intent to distribute cocaine and methaqualone. She consequently claims reversible error in the trial judge's denial of her motion for a directed verdict of acquittal. We disagree. Based on our evaluation of the evidence in a light most favorable to the government, *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we conclude that reasonable jurors could indeed have found the evidence inconsistent with every hypothesis of her innocence, *United States v. Moore*, 505 F.2d 620, 623 (5th Cir.), *cert. denied*, 421 U.S. 918, 95 S.Ct. 1581, 43 L.Ed.2d 785 (1975).

■ Possession of narcotics may be constructive or actual. *United States v. Goldstein*, 635 F.2d 356, 362 (5th Cir. 1981). A defendant's constructive possession of contraband may be established by circumstantial evidence of his or her ownership or control of the premises in which the contraband is hidden. *United States v. Moreno*, 649 F.2d 309, 312 (5th Cir. 1981). The apartment in which the instant drugs were concealed was owned by Joanne's mother and rented in Joanne's name; the cocaine and methaqualone introduced against her were recovered from a tall dresser in her bedroom containing women's clothing and from the nighttable near her bed. These facts, which provide ample evidence of her dominion over the premises from which the contraband was recovered, fulfill the requisite element of constructive possession.

Furthermore, the high purity of the cocaine found in the tall dresser and nighttable,[5] along with the recovery from her apartment of a substance used to cut cocaine, a large amount of cash ($10,500.00) and a weapon (.38 Smith & Wesson revolver concealed in the nighttable next to her bed) constitute surrounding circumstances from which Marszalkowski's intent to distribute is readily inferrable. *United States v. Grayson*, 625 F.2d 66 (5th Cir. 1980); *United States v. Muckenthaler*, 584 F.2d 240, 247 (8th Cir. 1978); *United States v. Mather*, 465 F.2d 1035 (5th Cir.), *cert. denied*, 409 U.S. 1085, 93 S.Ct. 685, 34 L.Ed.2d 672 (1972).

*Validity of Search Warrant*

■ The appellant would, however, have the court delete from its consideration of the sufficiency of the evidence all items seized from her apartment, including those found during execution of the search warrant. While supporting the trial court's invalidation of the warrantless entry to arrest Brock, she challenges its failure to strike as unnecessarily tainted the evidence found in the later search conducted pursuant to a warrant. She contends that the probable cause supporting issuance of the warrant was based on observations made in the apartment immediately after the unlawful entry; hence, given the illegality of the initial entry, all that followed was "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We need not explore, however, the merits of Marszalkowski's argument, since we agree with the government's response as appellee in *United States v. Marszalkowski*, No. 80–5597, and its identical argument as appellant in the separate appeal of *United States v. Brock*, No. 80–5621, that the agents' original entry comported fully with constitutional stricture.[6] *United States v. Allen*, 588 F.2d

---

5. Subsequent chemical analysis of the cocaine found in the bedroom pursuant to execution of the search warrant indicated that the 2.4 grams in the tall dresser, and the 25.3 grams and 10.5 grams in the nighttable next to the bed were, respectively, 86%, 84% and 85% pure. R.Vol. IX at 238–39, 247.

6. In the corrected opinion of *United States v. Congote*, 656 F.2d 971 (5th Cir. 1981), the fifth circuit affirmed the conviction of severed co-

1100, 1106 (5th Cir. 1980). We consider next our reasons for this conclusion.

## IV. Government's Appeal from Order of Suppression

*Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), represents the Supreme Court's most recent pronouncement regarding the elements necessary to support a warrantless entry to a suspect's home for arrest purposes. *Payton* holds that, absent exigent circumstances, probable cause by itself is insufficient to support a warrantless entry into a private residence for arrest. Although the facts of the instant case occurred nearly half a year prior to *Payton*, the trial judge applied *Payton's* standard in ruling on the defendants' motion to suppress.

 In our view, however, the established criteria for determining the retroactivity of a new constitutional rule, consisting of

(a) the purpose to be served by the new standards; (b) the extent of the reliance by law enforcement authorities on the old standards and (c) the effect on the administration of justice of a retroactive application of the new standards

*Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967), militate resoundingly against retroactive application of *Payton*. We note first that the purpose to be served by applying *Payton* retroactively is that of the exclusionary rule itself: deterrence of police activity violative of the fourth amendment. Since police could not have known of a future interpretation of the fourth amendment's mandate at the time the instant facts occurred, no possible deterrence of conduct in contravention of that future rule could ensue. *United States v. Peltier*, 422 U.S. 531, 542, 95 S.Ct. 2313,

2320, 45 L.Ed.2d 374 (1974); *Michigan v. Tucker*, 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1973). Indeed, police conduct in the instant situation reflected no less than justifiable, good faith reliance on what they reasonably believed to be the existing constitutional standard governing warrantless home arrests, recognized by the Supreme Court itself in *Payton* to be a "longstanding" nationwide practice. 445 U.S. at 598, 100 S.Ct. at 1386. Finally, the burden on the administration of justice were *Payton* to be applied retroactively would be massive. Since the practice of warrantless entry has been "widespread," *id.*,[7] clearly many convictions would be subject to reversal. Such reversal would be mandated despite the fact that the evidence suppressed would be highly probative. Indeed, the exclusion of reliable evidence seized prior to *Payton* would impair rather than enhance the pursuit of truth at trial. *Stone v. Powell*, 428 U.S. 465, 490–91, 96 S.Ct. 3037, 3050–3051, 49 L.Ed.2d 1067; *United States v. Williams*, 573 F.2d 348, 350 (5th Cir. 1978).

In recognition of precisely these concerns, the Supreme Court of the United States has refused to apply retroactively new standards established in analogous fourth amendment contexts:

It is indisputable ... that in every case in which the Court has addressed the retroactivity problem in the context of the exclusionary rule, whereby concededly relevant evidence is excluded in order to enforce a constitutional guarantee that does not relate to the integrity of the factfinding process, the Court has concluded that any such new constitutional principle would be accorded only prospective application.

---

defendant Jorge Congote. In so doing, it explicitly left open the issue of the validity of the initial entry and search:

The foregoing discussion of the asserted violations of the rights of Brock and Marszalkowski, upon which appellant claims standing to rely, are merely assumptions based upon the record in this case, including the magistrate's report. It is not to be construed

as a definitive holding that their respective rights were in fact violated.
*Id.* at 975, n.6.

7. The Supreme Court in *Payton* noted that "a majority of the States that have taken a position on the question permit warrantless entry into the home to arrest even in the absence of exigent circumstances." 445 U.S. at 598, 100 S.Ct. at 1386.

*United States v. Peltier*, 422 U.S. 531, 535, 95 S.Ct. 2313, 2316, 45 L.Ed.2d 374 (1975) (holding not retroactive the rule in *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), which requires probable cause to justify automobile searches conducted by roving border patrols). The Supreme Court has noted additionally that

> [i]f the purpose of the exclusionary rule is to deter unlawful police conduct then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.

422 U.S. at 542, 95 S.Ct. at 2320. *See also Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), (holding not retroactive the rule of *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), which mandates application of the fourth amendment's exclusionary rule to state criminal proceedings); *United States v. Corcione*, 592 F.2d 111, 118 (2d Cir. 1979).

In light of the above analysis, we hold that the balance of relevant considerations weighs heavily against retroactive application of the *Payton* standard.

The trial judge further indicated that pre-existing fifth circuit law was identical to *Payton* in requiring both probable cause and exigent circumstances to justify warrantless home arrests; that, as the trial judge found, exigent circumstances were not present here; and that, therefore, the warrantless entry must be deemed illegal even if *Payton* were held not retroactive. Our review, however, reflects that prior fifth circuit law was far from such a model of clarity.

Indeed, the Supreme Court in *Payton* appeared to have interpreted fifth circuit law as not requiring exigent circumstances, when it specifically contrasted *United States v. Williams*, 573 F.2d 348 (5th Cir. 1978) with *Payton*-like decisions of other circuits. 445 U.S. at 575, n.4, 100 S.Ct. at 1374. *United States v. Gaultney*, 581 F.2d 1137 (5th Cir. 1978), decided four months

after *Williams*, compounds the confusion. While asserting that a warrantless arrest of an individual at home grounded on probable cause and exigent circumstances would certainly be constitutional, it offers no insight as to whether such a combination is *necessary* to validate such an arrest:

> [I]t seems clear to us that, most assuredly, the Supreme Court [in *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)] was saying that officers do not always have to have a warrant to enter a house for the arrest of a felon. If they have probable cause to arrest for a felony and the exigencies of the situation make it imperative that they proceed without waiting to obtain a warrant the arrest is not constitutionally invalid. This is certainly the law as it exists in the Fifth Circuit.

581 F.2d at 1146. *See also United States v. Savage*, 564 F.2d 728, 733 (5th Cir. 1977) (upholding a warrantless search of motel room immediately following arrest based on probable cause alone), *United States v. Hofman*, 488 F.2d 287 (5th Cir. 1974) (upholding warrantless entry and search of motel room on basis of probable cause alone); *United States v. Wysocki*, 457 F.2d 1155 (5th Cir.), cert. denied, 409 U.S. 859, 93 S.Ct. 145, 34 L.Ed.2d 105 (1972) (upholding warrantless arrest in motel room based on probable cause and exigent circumstances, without discussion of whether exigent circumstances necessary).

We therefore reject the trial judge's conclusion that *Payton* represented no more than a re-articulation of what already was the established law in this circuit.

The court in *Gaultney* did find exigent circumstances in a situation closely analogous to the one at hand. One Francis Gilmere had offered to sell cocaine to undercover DEA agents. During police surveillance of the apartment from which Gilmere was observed carrying the drugs, three individuals were seen entering and departing. After Gilmere's arrest, police entered the apartment without a warrant and arrested three men found inside. A protective

sweep was then conducted during which contraband was found in plain view. On these facts, the warrantless arrest and ensuing search were upheld:

> The officers had good reason to believe that as much as ten pounds of cocaine was in the house. They saw, too, that considerations of privacy ordinarily attributable to a home were present in only minimal form. Gilmere had visited the house and quickly left with a package which he had not carried there. A woman soon left. Two men drove up in another vehicle and entered. The place was a beehive of activity, involving a comparatively large number of people who did not appear to be members of the family group. The officers could reasonably infer that those within the house were momentarily expecting the return of Gilmere, with $20,000 from the intended transaction at the restaurant; his failure to return would likely raise flags for people immersed in so dangerous an activity as the cocaine traffic.

581 F.2d at 1147.

Likewise, in the instant case, officers maintained surveillance of an apartment belonging to arrested co-conspirator Bennett's source. Having previously listened to a taped conversation between Bennett and his source, Brock, in which the latter had assured Bennett that he would obtain more drugs later that night or the next morning for another deal, the police's observation, as in *Gaultney*, of two individuals entering and leaving the apartment carrying packages gave rise to their reasonable belief of ongoing criminal activity within. Moreover, given Brock's instruction that Bennett should return to the apartment that night, Bennett's failure to do so, like Gilmere's failure to show in *Gaultney*, would surely have aroused Brock's suspicion. These circumstances, coupled with the relative ease with which narcotics may be disposed of, clearly meet, if not surpass, the requisite level of exigency found in *Gaultney*. *See also United States v. Tolliver*, 665 F.2d 1005, 1007–1008 (11th Cir. 1982). As the fifth circuit noted in *Gaultney*, drug dealers are likely to be

armed and dangerous. 581 F.2d at 1147. We consequently find that police effectuating Brock's arrest possessed both the right and the obligation to secure the apartment by conducting a protective sweep. *See United States v. Quigley*, 631 F.2d 415, 418–19 (5th Cir. 1980); *United States v. Bowdach*, 561 F.2d 1160, 1168–69 (5th Cir. 1977). Hence, even assuming *arguendo* the accuracy of the appellee's interpretation of pre-*Payton* fifth circuit law, we find, finally, that exigent circumstances were present in the instant situation and, on that basis, no justification existed for excluding the contraband found in plain view.

## V.

Based on the foregoing, we hereby AFFIRM the convictions of co-defendants Marszalkowski and Bennett in the case of *United States v. Marszalkowski*, no. 80–5597. In the separate appeal of the United States in the case of *United States v. Brock*, no. 80–5621, we hereby REVERSE the trial judge's suppression of evidence obtained during the initial warrantless search of the apartment conducted subsequent to the arrests and REMAND that case for trial.