**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**August Carl BENZ,**
**Defendant-Appellant.**

**No. 83–3168.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 4, 1984.

Anthony F. Gonzalez, Samuel R. Mandelbaum, Tampa, Fla., for Benz.

Lee W. Atkinson, Karla R. Spaulding, Asst. U.S. Attys., Tampa, Fla., for U.S.

Before GODBOLD, Chief Judge, TJOFLAT and HENDERSON, Circuit Judges.

TJOFLAT, Circuit Judge:

August Carl Benz was convicted in the district court on a two-count indictment of conspiracy to import over 1,000 pounds of marijuana into the United States and to possess that marijuana with intent to distribute (count one)[1] and of submitting a false statement and document to the U.S. Customs Service in an effort to recover his sailing vessel which Customs had seized after the marijuana had been imported (count two).[2] Benz appeals, questioning the sufficiency of the evidence to sustain his convictions and several of the district court's rulings, both before and during his trial. We conclude that the jury had ample evidence to convict Benz on both counts of the indictment and that the district court's challenged rulings were correct. We therefore affirm.

## I.

The crimes in this case involved the actions during the summer and fall of 1981 of several people who frequented a St. Petersburg marina. Some transacted business at the marina: appellant Benz chartered boats, among them the *Carpe Diem*, a forty-eight foot sail boat; Debra Engh was Benz' secretary; John Hunt was a skilled sailor and sailmaker who had made a set of

---

1. Benz and five others were charged in count one under 21 U.S.C. §§ 846, 963 (1982) with conspiring to violate 21 U.S.C. §§ 952(a), 960 (1982) (proscribing the importation of controlled substances, including marijuana) and 21 U.S.C. § 841(a) (1982) (proscribing the possession of controlled substances, including marijuana, with intent to distribute). Sections 846 and 963 contain identical language but deal with different subchapters of the drug law: section 846 refers to Subchapter I, Control and Enforcement; section 963 refers to Subchapter II, Import and Export. These two sections provide:

 Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

2. Benz and two of the conspirators indicted in count one, Laurie Miller and Debra Engh, were charged in count two under 18 U.S.C. §§ 1001, 2 (1982). Section 1001 provides:

 Whoever, in any matter within the jurisdiction of any department or agency of the United States [e.g., U.S. Customs Service] knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

 Section 2 provides:
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

sails for the *Carpe Diem;* Douglas Lee, Michael Ernst, and Steve Maros, who was Debra Engh's boyfriend, had at some point done some work around the marina; Laurie Miller had lived for a while on a houseboat at the marina, before moving to a house in the area. She was a former employee of the U.S. Customs Service and knew many of the Customs officers stationed in the area. Ed Cowart was her boyfriend.

In September 1981, Cowart and Hunt discussed the possibility of smuggling a load of marijuana into the United States. They broached the idea with Benz, Maros, and Miller, and soon they all agreed on a plan to transport several thousand pounds of marijuana from Aruba, in the Lesser Antilles, to Florida aboard Benz' sailboat, the *Carpe Diem.* Hunt, as captain, would sail the vessel; Maros and Lee would serve as the crew during portions of the voyage. Miller showed them photographs of several Customs agents she knew whom they might encounter during their trip.

In late September, Hunt and Lee set sail from St. Petersburg, bound for the Cayman Islands. There Hunt placed a telephone call to Cowart for instructions on how to proceed once the *Carpe Diem* got to Aruba. Hunt was unable to reach Cowart, however, so he called Benz. He asked Benz to have Cowart call him in the Caymans, and Cowart subsequently did so. Thereafter, Hunt, Lee, and Maros, who had joined them, sailed for Aruba. Following Cowart's directions, they met a trawler off the coast of Aruba and took on around 200 forty to fifty pound bales of marijuana. By this time, it was early December 1981. The *Carpe Diem* then sailed to a point off the Florida coast where they rendezvoused with Cowart and Ernst who were aboard the *Suzi Q.* The two vessels proceeded to Cedar Key and off-loaded the marijuana there. Hunt and Maros then sailed the *Carpe Diem* to a point off the west Florida coast, near Hernando Beach, where they

left the boat. They then returned to St. Petersburg. Hunt later spoke with Benz and Cowart about when he would be paid for his efforts; he eventually collected over $13,000.[3]

On December 17, 1981, Customs officers on routine patrol found the abandoned *Carpe Diem.* They seized the boat[4] and collected marijuana residue from its deck. On December 19, a Coast Guard officer found the *Suzi Q* anchored elsewhere off the Florida coast. It too was unoccupied and covered with marijuana residue.

Meanwhile, Benz sent Douglas Lee to retrieve the *Carpe Diem,* but Lee could not find the boat because it had been seized. Customs subsequently sent Benz a notice of seizure; he responded with a Petition for Remission or Mitigation of Forfeiture, prepared by his attorney. Attached to the petition was a charter agreement purporting to show that the *Carpe Diem* had been chartered by Benz to an Edgar Picado at the time of the seizure. The signature "Edgar Picado" was in Miller's handwriting.

Customs managed to learn of Hunt's involvement in the smuggling incident and persuaded him to testify against the others. On September 16, 1982, Benz, Miller, Cowart, Engh and Maros were indicted. All were charged with conspiracy to import and to possess with intent to distribute marijuana;[5] Benz, Miller, and Engh were charged with submitting a false statement and document to Customs in an effort to recover the *Carpe Diem.*[6] Benz and Miller were arrested; the other indictees became fugitives and are still at large.

Prior to trial, Benz moved the court to dismiss the indictment, contending that it had been returned against him in retaliation for his efforts to recover the *Carpe Diem.* Benz also moved for a severance of parties and of counts. He sought a severance of counts because he wished to testify

---

3. The record does not indicate who gave Hunt the money.

4. Customs seized the *Carpe Diem* under the authority conferred by 19 U.S.C. § 1595a (1982).

5. *See supra* note 1.

6. *See supra* note 2.

only to count two of the indictment. The court denied Benz' motions to dismiss and for severance, and the case proceeded to trial.

The trial began with opening statements by counsel both for the government and Benz. The government's statement was straightforward; the government would prove that Benz was one of the principals of the smuggling enterprise and that he submitted a false statement and document to Customs in an effort to set aside the government's forfeiture of the *Carpe Diem*. Benz' false statement, contained in his affidavit, was that the *Carpe Diem* was under charter to Edgar Picado during the period of time covered by the conspiracy and that he, Benz, had played no role in the smuggling venture. The false document was a fake agreement purporting to establish that Benz had chartered the *Carpe Diem* to Picado. Benz' opening statement was somewhat equivocal. He denied outright any involvement in the smuggling venture, but he offered no explanation for the false charter agreement which, the parties stipulated, bore his genuine signature and the name Edgar Picado signed by Laurie Miller.

In its case-in-chief the prosecution established the facts we have related *supra*, principally through the testimony of Hunt, Douglas Lee, and the Customs officers who seized the *Carpe Diem* and the *Suzi Q*. The government also proved that, following Customs seizure of the *Carpe Diem*, Benz had possession of a piece of letterhead stationery from his boat chartering business, with the name Edgar Picado written on it several times in Laurie Miller's handwriting.

In his defense Benz called three witnesses, Benz' brother and two witnesses who simply attacked Hunt's credibility. Benz' brother testified that Benz had shown him a blank charter agreement in the month preceding the smuggling trip, asking if it accorded him, as a charterer, sufficient pro-

tection for a long-term charter he was about to make. In turn, Benz' brother had shown the document to his lawyer, who had approved it. Benz attempted to place into evidence records from his charter business without authenticating them. He was the only person who could authenticate the records, but he would not take the witness stand. The court consequently excluded the evidence, and Benz' defense rested.

Miller then presented her defense and chose to testify. She denied participating in the smuggling scheme. She admitted that she had known the other indictees socially but insisted that that was all. She also admitted that she had signed Edgar Picado to the charter agreement Benz had presented to Customs with his Petition for Remission or Mitigation of Forfeiture. Miller explained that she signed Picado's name at the request of Benz' secretary, Debra Engh, because she thought from something that Cowart had told her that Edgar Picado had in fact chartered the *Carpe Diem*.

Benz cross-examined Miller. During the course of the examination he sought to have Miller identify copies of an undated handwritten letter and an envelope, apparently composed and mailed in December 1978,[7] and to introduce them into evidence. The letter, purportedly from Cowart to a man in South America, described a scheme for smuggling marijuana aboard a boat to be captained by Picado. Both the prosecutor and Miller objected on hearsay grounds to the receipt in evidence of the letter and envelope, and the court sustained their objection.

Miller then announced that she intended to call Benz as a witness. Outside the jury's presence Benz stated that he would invoke his fifth amendment right to remain silent in response to any question Miller asked. He added that he would testify if the court severed the conspiracy count from the case. The court declined to do

---

7. The letter was undated. The envelope was postmarked. The postmark is barely legible, but appears to indicate a December 1978 date.

so,[8] and Benz did not testify. Miller's final witness would have been Benz' trial attorney.[9] The court, sustaining Benz' objection, refused to allow him to testify, however.

At the close of all the evidence, Miller moved for a mistrial on the ground that the court's ruling concerning the attorney's testimony materially prejudiced her defense. The court granted her motion and severed her from the case. At this point, Benz moved the court to strike Miller's testimony from the record and to instruct the jury to disregard it. His motion was denied.

Benz' closing argument to the jury resembled his opening statement. His attorney reiterated that the government had not shown Benz to have been a member of the smuggling enterprise. He then implied that Benz had thought the false charter agreement to be genuine. Later, he implied that Benz had chartered the boat to Cowart or to Hunt and that Picado may have been involved with them in the background. The jury was not persuaded; it returned verdicts of guilty on both counts of the indictment.

On appeal, Benz presents seven claims of error. One calls for us to acquit him; the rest call for us to grant him a new trial. He claims that he is entitled to a judgment of acquittal on each count because the evidence was insufficient to support his conviction. He claims that he is entitled to a new trial on the following grounds. First, the trial judge erred in instructing the jury on the conspiracy element of the count one

offense. Second, the judge erred in denying his motion for a severance of counts. Third, the judge erred in allowing Miller's testimony to go to the jury after granting her a mistrial. Fourth, the prosecution failed to disclose certain Jencks Act statements and *Brady* material. Fifth, the judge should have granted him a mistrial when Hunt, on cross-examination in the government's case-in-chief, referred to a prior drug smuggling incident involving Benz. Sixth, a claim raised in his reply brief to this court, the judge erred in excluding the Cowart letter that referred to Picado.

## II.

In reviewing the sufficiency of the evidence to support Benz' convictions, we must view the evidence in the light most favorable to the government, "drawing all reasonable inferences therefrom, and making the credibility choices that support the jury's verdict [to determine whether] a reasonable jury could have found [Benz] guilty beyond reasonable doubt." *United States v. Pierre*, 688 F.2d 724, 725 (11th Cir.1982). The evidence may be sufficient though it does not "exclude every reasonable hypothesis of innocence or [is not] wholly inconsistent with every conclusion except that of guilt." *Id.* We conclude that the evidence presented at Benz' trial was plainly sufficient to convict him on both counts of the indictment.

The prerequisites to a finding of guilt on the conspiracy count are proof

---

8. Arguably, Benz' statement, that he would testify if the court severed the count one conspiracy charge from the case, was tantamount to a motion for a mistrial for both defendants as to that charge. Miller, however, did not request such relief, thus indicating that she wished to proceed to a verdict on both counts of the indictment with the jury that had been empanelled to try the case. Accordingly, a declaration of mistrial as to Miller would have operated under the double jeopardy clause to acquit her of the count one conspiracy charge unless manifest necessity for the mistrial existed. *See United States v. Dinitz*, 424 U.S. 600, 608, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976).

9. Benz' counsel would have testified that Miller was never present during his preparation of Benz' Petition for Remission or Mitigation of Forfeiture, allowing the inference that she did not know, when she signed the form, that it would be submitted to Customs. The law on whether such knowledge was an element of the 18 U.S.C. § 1001 (1982) offense was unclear at the time this case was tried. However, the Supreme Court, in *United States v. Yermian*, —— U.S. ——, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984), has now decided that knowledge that a false statement is in the jurisdiction of a government agency is not an element of a section 1001 offense.

beyond a reasonable doubt of the conspiracy's existence, Benz' knowledge of it, and his agreement to become a member. *United States v. Marszalkowski*, 669 F.2d 655, 661 (11th Cir.), *cert. denied*, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 167 (1982). Benz was present at several meetings where the smuggling venture was discussed. His boat was used to transport the marijuana. He asked Hunt to captain the boat. He acted as liaison between Hunt and Cowart once during the trip. Finally, Benz knew to send Lee to look for the *Carpe Diem* at Hernando Beach where Hunt and Maros had left it. A jury could reasonably infer Benz' knowledge of and participation in an extant conspiracy to import marijuana into the United States.

 A jury could also reasonably infer that Benz knowingly and wilfully presented a false statement and document to Customs, as alleged in count two. Benz' attorney filed the Petition for Remission or Mitigation of Forfeiture with Customs so that Benz could recover the *Carpe Diem*. He attached to the petition Benz' affidavit and a false charter agreement purporting to show that Benz had chartered the *Carpe Diem* to Edgar Picado. Picado's signature had been forged by Laurie Miller after she had practiced signing it several times on a piece of stationery bearing the letterhead of Benz' charter company. Benz subsequently had this piece of stationery in his possession. The reasonable inferences from these facts were that Benz knew the charter agreement was false and that it would be submitted to Customs with an affidavit containing his false statements about the transaction.[10]

### III.

#### A.

Benz requested that the jury be instructed as follows:

"Even through the defendant's presence at the scene of a crime might be 'highly

suspicious,' 'this is not a substitute for evidence sufficient to prove beyond a reasonable doubt. Although it is certainly possible—maybe even probable—that (the Defendant) was involved in the conspiracy, such speculation does not constitute proof beyond a reasonable doubt, and juries must not be permitted to convict on suspicion and innuendo.' " *U.S. v. DeSimone*, 660 F.2d 532 at 537, *U.S. v. Rozen*, 600 F.2d 494 at 497, and *United States v. Littrell*, 574 F.2d 828, 833 (5th Cir., 1978).

\* \* \* \* \* \*

"In order for the Government to prove the Defendant's involvement in a conspiracy beyond a reasonable doubt, 'it is not enough for it merely to establish a climate of activity that reeks of something foul' "—*DeSimone*, 660 F.2d at 537 and *U.S. v. Wieschenberg*, 604 F.2d 326 at 331–332.

The district judge denied his request.

 The court's refusal to deliver Benz' requested instruction constituted reversible error only if the requested instruction (1) was correct, (2) was not substantially covered by the court's charge to the jury, and (3) dealt with some point in the trial so important that the failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense. *United States v. Stone*, 702 F.2d 1333, 1339 (11th Cir.1983).

 In this case, the judge gave Fifth Circuit Pattern Jury Offense Instruction 3, on conspiracy, which stated in relevant part:

Of course, mere presence at the scene of an alleged transaction or event or mere similarity of conduct among various persons and the fact that they may have associated with each other, and may have assembled together and discussed common aims and interests does not necessarily establish proof of the existence of the conspiracy.

---

**10.** It should be noted that knowledge that the document would be submitted to Customs was not a prerequisite for liability under 18 U.S.C.

§ 1001 (1982). *United States v. Yermian, supra* note 9.

Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some object or purpose of a conspiracy, does not thereby become a conspirator.

\*　　\*　　\*　　\*　　\*　　\*

Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime, unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.

These instructions substantially covered the instructions Benz requested. Accordingly, the judge did not err in refusing to give those instructions.

■ Benz next argues that the judge erred in omitting the pattern jury instructions on overt acts from the charge he gave. The former Fifth Circuit has held that no allegation or proof of an overt act is required for a conviction under 21 U.S.C. §§ 846 or 963, the statutes on which the count one conspiracy charge was founded in this case. *United States v. Rodriguez*, 612 F.2d 906, 919 n. 37 (5th Cir.), *cert. denied*, 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980). Accordingly, a jury instruction regarding overt acts was unnecessary. We agree with the Seventh Circuit's observation that "[i]f an overt act need not be charged, it need not be proved. If an overt act need be neither charged nor proved, there remains nothing about which to instruct on that issue." *United States v. Umentum*, 547 F.2d 987, 991 (7th Cir. 1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977). *See also United States v. Brown*, 692 F.2d 345, 348 (5th Cir.1982).

B.

■ Benz claims that the district judge abused his discretion in refusing to sever counts one and two for trial.[11] The grant or denial of such a severance is within the discretion of the trial court and that denial will not warrant reversal unless clear prejudice is shown. *United States v. Park*, 531 F.2d 754, 761 (5th Cir.1976). The burden of demonstrating prejudice is a difficult one and the ruling of the trial judge will rarely be disturbed on review. *Id.* at 762 (quoting *Tillman v. United States*, 406 F.2d 930, 934 (5th Cir.1969)), *vacated in part on other grounds*, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969).

■ In deciding the motion to sever under Fed.R.Crim.P. 14, the trial judge was required to balance the prejudice to the defendant against the interests of judicial economy. *United States v. Forrest*, 623 F.2d 1107, 1115 (5th Cir.), *cert. denied*, 449 U.S. 924, 101 S.Ct. 327, 66 L.Ed.2d 153 (1980). Where, as here, the defendant sought a severance of counts because he wished to testify to the false statement charge but not the conspiracy, he was required to demonstrate "that he ha[d] both important testimony to give concerning one count and strong need to refrain from testifying on the other." *Id.* (quoting *Baker v. United States*, 401 F.2d 958, 977 (D.C.Cir. 1968), *cert. denied*, 400 U.S. 965, 91 S.Ct. 367, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970)).

■ Benz contends that if he had been able to testify in defense of the false statement count alone, he would have presented the following "important" evidence which he proffered to the trial judge. First, he would have introduced some business records indicating that he had a legitimate charter business. Second, he would have testified to what he said in the affidavit he submitted with his Petition for Remission

---

11. Fed.R.Crim.P. 14 provides, in pertinent part:
 If it appears that a defendant ... is prejudiced by a joinder of offenses ... in an indictment ... or by such joinder for trial together, the court may order an election or separate trials of counts, ... or provide whatever other relief justice requires....

 It should be observed that the two counts in this case were properly joined under Fed.R. Crim.P. 8(a) initially since they were certainly based on the same "transaction or two or more acts or transactions connected together or constituting parts of a common scheme or plan," as that rule contemplates.

or Mitigation of Forfeiture; i.e., that he had chartered the *Carpe Diem* to Edgar Picado from September 9, 1981, to December 30, 1981, and that he did not know or have reason to believe that Picado would engage in unlawful conduct during the charter period.[12]

Benz asserts that he had a "strong need to refrain from testifying" on the conspiracy count because he would have been subject to broad cross-examination regarding his business and social relationships with the alleged coconspirators, arousing the jury's speculation that "these legitimate involvements extended into the illicit." He submits that his relationship with the parties to the conspiracy would have been irrelevant in a trial restricted to count two and thus would not have been exposed either in the government's case-in-chief or in the government's cross-examination of him about the existence of a charter agreement with Edgar Picado.

We note initially that Benz misjudges the extent to which he could have limited his cross-examination had count two been tried alone. As the district court pointed out in denying Benz' motion for a severance of counts, at a trial restricted to count two the prosecutor could have exposed the smuggling enterprise and Benz' involvement in it in order to show why Benz might have been inclined to fabricate the charter agreement. And if Benz took the stand, he would have subjected himself to the same cross-examination he would have faced had he testified in the proceedings below. *Cf. United States v. Bronco*, 597 F.2d 1300, 1302 (9th Cir.1979) (denial of motion for severance reversible error because of prejudice to defendant where "same jury would hear the evidence of all crimes and [defendant] would not be able to testify about one set of events without being cross-examined on the other.") Moreover, Benz' testimony

could be used by the government in its case-in-chief or as impeachment in a subsequent trial on the conspiracy count. *See* Fed.R.Evid. 804(b)(1). Knowing this, Benz might well have decided not to testify if he had been granted a severance.

Putting aside the weakness in Benz' argument that he had a strong need to refrain from testifying in defense of the conspiracy charge, however, we find the trial judge to have acted within his discretion in denying the severance mainly because the testimony Benz proffered, and contends he would have given, was not sufficiently important in the context of his trial to demonstrate clear prejudice. First, the records of his charter business were not important because the government never argued that Benz did not have a legitimate charter business. The government only contended that the Edgar Picado charter was a sham. That Benz ran a charter business was presented explicitly to the jury in Benz' cross-examination of Douglas Lee. That Benz ran such a business was also implicit in both the prosecution and defense theories of the case. Since the legitimacy of the business in general was not challenged, the business records were not needed to prove such legitimacy. Second, the notion that Benz had chartered the *Carpe Diem* to Picado from September to December 1981 and that Benz had no idea the boat was being used for illicit purposes was before the jury in the form of his verified Petition for Remission or Mitigation of Forfeiture. While Benz' attorney did not stress this point forcefully to the jury, the evidence before the jury would have given him ample license to do so.

In *United States v. Outler*, 659 F.2d 1306 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 950, 102 S.Ct. 1453, 71 L.Ed.2d 665 (1982),[13] as here, the facts, to which the

---

12. Benz also requested the court to grant him an *in camera* hearing so he could proffer other testimony without running the risk of a prosecution "discovery session." The court denied this motion, and Benz made no proffer. Benz has not informed us of what he would have submitted *in camera;* accordingly, we have no ad-

ditional evidence to weigh in evaluating any prejudice Benz may have suffered.

13. In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

defendant would have testified if he had been granted a severance of counts, were presented to the jury through other testimony. Accordingly, the predecessor to this court found no clear prejudice to the defendant's case in the trial court's denial of his motion for a severance. Similarly, we find that Benz' statement in support of his Petition for Remission or Mitigation of Forfeiture presented to the jury the facts to which he would have testified. The district court did not abuse its discretion in refusing to sever the two counts of the indictment.

### C.

At the close of all the evidence, the district court granted Miller a mistrial. The court did so because it had prevented Miller from calling Benz' trial attorney as a witness in her defense. The court thereafter refused Benz's request that the jury be instructed to disregard Miller's testimony in considering the government's case against Benz. Benz claims that this ruling caused him substantial prejudice, because his and Miller's defenses had been inconsistent; accordingly, he is entitled to a new trial. For purposes of analysis, we treat Benz' claim as discrete attacks on two of the district court's rulings: its denial of Benz' pretrial motion to sever his case from Miller's, and its refusal to instruct the jury to disregard her testimony.

 The court denied Benz' pretrial motion for a severance of parties because it was satisfied that Benz would not be prejudiced by being tried with Miller. That determination was well within the court's discretion. Interests of judicial economy generally counsel that coconspirators be tried jointly; we reverse a trial judge's denial of a motion to sever only when the appellant can demonstrate that the denial caused him "compelling prejudice." *United States v. Marszalkowski,* 669 F.2d 655, 660 (11th Cir.), *cert. denied sub nom. Brock v. United States,* 459 U.S. 906, 103 S.Ct. 208, 74

L.Ed.2d 167 (1982). "Compelling prejudice" means that the jury will not be able to "collate and appraise the independent evidence against each defendant.... [T]hough the task be difficult [unless the jury cannot perform it] severance should not be granted." *Tillman v. United States,* 406 F.2d 930, 935 (5th Cir.), *vacated in part on other grounds,* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969). With this standard in mind, we assess the reasonableness of the trial judge's exercise of discretion when he denied Benz' pretrial motion to sever the parties.

 At the time the judge considered the motion there was no indication that a joint trial would cause Benz to suffer compelling prejudice. Nothing Benz presented in support of his motion suggested, for example, that his defense would be at odds with Miller's. He should have expected the court to deny his motion, and the court properly did so.

 That the denial of a pretrial motion for a severance may have been proper does not necessarily end the severance matter, however. The judge may be obliged to reconsider his ruling at trial; the parties' defenses may become irreconcilable and the defendant may request a severance of his case and the declaration of a mistrial. In the situation before us, the defendant, Benz, never moved for a mistrial; he simply requested the court to strike Miller's testimony and to give the jury an accompanying prophylactic instruction. Implicit in this request was the representation to the court that he had not incurred the sort of compelling prejudice required for a mistrial and that the court's counselling of the jury would satisfactorily alleviate any improper prejudice that may have occurred as a result of the joint trial.[14]

 We will assume, however, for the sake of discussion, that Benz moved for a mistrial on the ground that Miller's defense had so conflicted with his defense as to

---

14. The trial judge properly kept the fugitive status of Benz' and Miller's codefendants from the

knowledge of the jury.

deny him a fair trial and that the court denied his motion, concluding that the parties defenses had not "conflict[ed] to the point of being irreconcilable and mutually exclusive." *United States v. Crawford,* 581 F.2d 489, 491 (5th Cir.1978). The record amply supports such a conclusion.

The potential for conflict first arose when Miller took the stand in her defense. (Benz' defense had previously rested.) But no conflict materialized. Miller testified that she had signed the Picado charter agreement while she was meeting with Benz' secretary, Debra Engh, for another purpose. Engh told Miller that the original agreement had been stolen. She asked Miller to sign Picado's name to a replacement and produced a form agreement for that purpose. Miller, thinking Picado had actually chartered the *Carpe Diem* because her boyfriend Ed Cowart had previously told her Picado had the boat, accommodated Engh and signed the form. At the time she signed it, she testified, Benz' signature was not on the document.

This testimony was perfectly reconcilable with the various scenarios Benz presented to the jury: that he thought Picado had the boat and thought the charter agreement submitted to Customs was genuine; that he thought Hunt had the boat; that he thought Cowart had the boat; that in any event Benz never had the boat while the alleged conspiracy was in progress and knew nothing of the conspiracy. Miller never claimed that Engh was acting for Benz when Engh asked her to place the name Edgar Picado on the form. The jury, had they believed Benz and Miller, could have determined that the entire smuggling operation was coordinated by Cowart, Engh, and Engh's boyfriend, Maros, without Benz', or Miller's, knowledge or consent. Benz thus fails to show that Miller's testimony produced a trial of "irreconcilable and mutually exclusive" defenses, the sort of "compelling prejudice" that would mandate the declaration of a mistrial had Benz requested such relief.

Since the court was never required to grant a severance or, after the jury was sworn, a mistrial, the question becomes simply whether the trial judge should have stricken Miller's testimony from the record and instructed the jury to disregard it. In answering this question, we inquire, first, whether Miller's testimony was relevant to any material issue in Benz' case. If it was, it was admissible. See Fed.R.Evid. 402. Miller's testimony was plainly relevant to both counts. It yielded inferences that Benz engineered the forgery of the charter agreement in its assertions that Benz' secretary, Debra Engh, got Miller to forge Picado's name. It also confirmed the stipulated falsity of the agreement. Regarding count one, the testimony tended to corroborate parts of Hunt's testimony.

■ In arguing that the trial judge should have stricken Miller's testimony, Benz does not contend that the testimony was irrelevant, or if relevant that it should have been excluded because "its probative value [was] substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R. Evid. 403. His argument is, simply, that the testimony should have been stricken because it would not have been forthcoming had he been tried separately. His argument is specious. If this argument is given currency, it is one which will surface in every multiple defendant trial after a codefendant has been dismissed. We could not countenance a rule which holds that the district court, after the dismissal of a codefendant, must strike wholly relevant, probative evidence from the record merely because it was introduced by the codefendant rather than the government. Moreover, the result is no different than if Miller had been acquitted or granted post-conviction relief.

■ In sum, the trial judge properly denied Benz' pretrial motion for a severance of parties. He also ruled correctly in refusing to strike Miller's testimony. The testimony was plainly relevant. Moreover, the judge's general charge to the jury certainly enabled the jury to collate and appraise the individual evidence against Benz. *Tillman,* 406 F.2d at 935.

### D.

Benz contends that the government should have produced for his impeachment of Hunt certain DEA-issued receipts showing that Hunt obtained money from the DEA for "purchase of information." Benz argues that he was entitled to these statements under his general pretrial discovery request, the rules of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Jencks Act, 18 U.S.C. § 3500 (1982), and Fed.R.Crim.P. 16.

■ We first note that Benz has no Jencks Act claim because he did not make a proper Jencks Act motion for the production of Hunt's statements following the prosecutor's direct examination of Hunt. *See United States v. Liuzzo,* 739 F.2d 541, at 544 (11th Cir.1984); *United States v. Gatto,* 533 F.2d 264, 265 (5th Cir.1976); 2 C. Wright, *Federal Practice and Procedure: Criminal 2d* § 438. Nor does Benz present a Rule 16 claim because that rule incorporates the limitations of the Jencks Act on discovery of government witness statements. Fed.R.Crim.P. 16(a)(2). Benz' *Brady* claim presents a slightly more substantial question.

■ *Brady* asserts that the "suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196, 1197. The former Fifth Circuit addressed extensively the application of *Brady* in *United States v. Anderson,* 574 F.2d 1347 (5th Cir.1978). The court described the four distinct categories of *Brady* problems:

(1) the prosecutor has not disclosed information despite a specific defense request; (2) the prosecutor has not disclosed information despite a general defense request for all exculpatory information or without any defense request at all; (3) the prosecutor knows or should know that the conviction is based on false evidence.... [4] the prosecutor fails to disclose purely impeaching evidence not concerning a substantive issue, in the absence of a specific defense request.

*Id.* at 1353. The court went on to note that each category required the application of a distinct test in order to assess whether the defendant's due process right to a fair trial had been violated.

Benz' pretrial motion for discovery of any evidence impeaching coconspirators' statements made in the course and furtherance of the conspiracy was not a sufficiently specific request for the DEA receipts to fall under the first category. *See id.* at 1351, 1354 (motion requesting "[t]he recorded testimony of any codefendant ... before the grand jury ... which relates to the offense charged" and "[a]ll books, papers, documents ... material to the defense" not sufficiently specific to warrant application of first category standard of review to nondisclosure of FBI witness interview report). The situation certainly does not fall under the third category; it does not involve perjured testimony. Accordingly, the DEA receipts could be analyzed under the second or fourth category. We apply the test for the second category because it incorporates a lower standard of materiality, i.e., that reversal is required if the omitted evidence creates a reasonable doubt that did not otherwise exist, than does the fourth category, which would require reversal only if the undisclosed evidence would probably have resulted in an acquittal. *Id.* at 1354.

Even applying the former standard to the facts of this case, we find no *Brady* violation. The standard DEA form receipts would have provided some additional support for the stringent cross-examination Benz' counsel conducted of Hunt and DEA Agent Haines regarding the payments, because they indicated that the purpose of the payments was a "purchase of information," presumably about drug smuggling, including the activities of the defendants in this case. However, Benz' counsel delved thoroughly and extensively into the amounts and nature of the payments, and argued them to the jury as Hunt's "license to lie." Agent Haines and Hunt readily

admitted the payments, though they stated that the money was for subsistence and expenses. Had the evidence come in, the term "purchase of information" on the standard form receipt would likely have been explained as a usual administrative classification of witness payments. The evidence of the payments was sufficiently presented to the jury, and the receipts would not have created a reasonable doubt that did not otherwise exist.

### E.

Benz complains that Hunt gave a nonresponsive answer to one of his questions on cross-examination which prejudiced him sufficiently to warrant reversal of his convictions. Benz' counsel objected to Hunt's answer, and the judge immediately instructed the jury to disregard it. The colloquy was as follows:

Q Okay. And when can you tell this jury you actually [started your own sailmaking business?]

A I can't exactly say the date.

Q September of '81 is when you have testified you went on the *Carpe Diem;* it was prior to that?

A It was the same month—if I could find my records, and he has them, it was the same month that I made sails for him to take his boat[15] down with—my partner, Stretch Sterrett, take his boat down to Columbia with Carl and Tom something, to go and pick up a load. And that's when the business went bankrupt.

After a sidebar conference at which Benz' counsel moved for a mistrial, the court instructed the jury:

THE COURT: Ladies and gentlemen, the answer that this witness just gave in response to that last question is being stricken by the Court. It is stricken as not being responsive to the question.

So, having stricken it, you are now instructed to disregard it in any way in your deliberations over the guilt or inno-

cence of either of these defendants in this case.

The general rule in this circuit is that, if the trial judge strikes erroneously admitted evidence from the record with an instruction that the jury disregard it, the error is cured unless the evidence is so highly prejudicial as to render the error incurable. *United States v. Slocum,* 708 F.2d 587, 598 (11th Cir.1983). We do not find Hunt's slip to have been so highly prejudicial as to render the error incurable.

### F.

Benz' final point is that the court erred in refusing to admit the "Picado letter" into evidence. He raises this point only in his reply brief. Arguments raised for the first time in a reply brief are not properly before the reviewing court. *Knighten v. Commissioner of Internal Revenue,* 702 F.2d 59, 60 (5th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 249, 78 L.Ed.2d 237 (1983); *Bugg v. International Union of Allied Industrial Workers of America,* 674 F.2d 595, 598 (7th Cir.1982), *cert. denied,* 459 U.S. 805, 103 S.Ct. 29, 74 L.Ed.2d 43 (1983); *United States v. Ewing,* 445 F.2d 945, 949 n. 8 (10th Cir.1971) *vacated on other grounds,* 413 U.S. 913, 93 S.Ct. 3031, 37 L.Ed.2d 1022 (1973); *see* 16 C. Wright, A. Miller, E. Cooper & E. Gressman, *Federal Practice and Procedure* § 3974, at 428 (1977). Accordingly, we do not address this argument.

AFFIRMED.

---

**15.** The record does not indicate for whom Hunt made the sails or the identity of the boat. Moreover, the prosecutor, in his closing argu-

ment to the jury, made no suggestion that Hunt was referring to Benz and the *Carpe Diem.*