**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Laurie MILLER, Defendant-Appellant.**

Nos. 83–3185, 83–3319.

United States Court of Appeals,
Eleventh Circuit.

Sept. 27, 1984.

Rehearing and Rehearing En Banc Denied Nov. 6, 1984.

Rick B. Levinson, Tampa, Fla., for defendant-appellant in both cases.

Karla R. Spaulding, Asst. U.S. Atty., Tampa, Fla., for plaintiff-appellee in both cases.

Stevan T. Northcutt, Tampa, Fla., for defendant-appellant in No. 83–3319.

Lee W. Atkinson, Asst. U.S. Atty., Tampa, Fla., for plaintiff-appellee in No. 83–3319.

Before GODBOLD, Chief Judge, TJOFLAT and HENDERSON, Circuit Judges.

TJOFLAT, Circuit Judge:

Appellant Laurie Miller and August Carl Benz (and others who have skipped bail and are fugitives) were indicted, in two counts, in the Middle District of Florida for conspiring to import over 1,000 pounds of marijuana into the United States and to possess that marijuana with intent to distribute (count one)[1] and for submitting a false document to the U.S. Customs Service in connection with Benz' attempt to recover from Customs the sailing vessel used to carry out the conspiracy (count two).[2] Miller and Benz were tried together before a jury. In her defense, Miller attempted to call Benz' trial attorney as a witness for the announced limited purpose of showing that she had not knowingly submitted to Customs the false document described in count two of the indictment. The court, sustaining Benz' objection, refused to allow the attorney to testify, and Miller moved for a mistrial. The court granted her motion.[3] After the court scheduled her case for retrial, Miller moved to dismiss the indictment with prejudice, claiming former jeopardy.[4] Miller's motion was denied, her case proceeded to trial, and she was convicted on both counts. In these consolidated appeals,[5] Miller presents alternative

---

1. Miller, Benz, and three others, Debra Engh, Ed Cowart, and Steve Maros, were charged in count one under 21 U.S.C. §§ 846, 963 (1982) with conspiring to violate 21 U.S.C. § 952(a), 960 (1982) (proscribing the importation of controlled substances, including marijuana) and 21 U.S.C. § 841(a) (1982) (proscribing the possession of controlled substances, including marijuana, with intent to distribute). Sections 846 and 963 contain identical language but deal with different subchapters of the drug law: section 846 refers to Subchapter I, Control and Enforcement; section 963 refers to Subchapter II, Import and Export. These two sections provide:

   Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

2. Miller, Benz, and one of the other conspirators indicted in count one, Debra Engh, were charged in count two under 18 U.S.C. §§ 1001, 2 (1982). Section 1001 provides:

   Whoever, in any matter within the jurisdiction of any department or agency of the United States [e.g., U.S. Customs Service] knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

   Section 2 provides:
   (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
   (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

3. The trial as to Benz continued, and the jury found him guilty as charged. *See United States v. Benz,* 740 F.2d 903, 909 (11th Cir.1984).

4. Miller claimed that the double jeopardy clause of the fifth amendment precluded her retrial. That clause provides, in pertinent part: "[n]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const.Amend. V.

5. Appeal No. 83–3185 is Miller's interlocutory appeal from the district court's denial of her motion to dismiss the indictment on double jeopardy grounds. Appeal No. 83–3319 is Miller's appeal from her convictions.

claims: that her retrial was barred by the double jeopardy clause of the fifth amendment and that the evidence was insufficient to support her convictions. We affirm.

## I.

The facts established by the prosecution in this case have been set out in *United States v. Benz*, 740 F.2d 903 at 906 (11th Cir.1984). We restate them here, in the light most favorable to the government,[6] giving emphasis to those facts relevant to Miller's convictions.

In September 1981, Laurie Miller, a former employee of the U.S. Customs Service, and her boyfriend, Ed Cowart, were living together in a house in St. Petersburg, Florida. They knew most of the people who ran a certain marina in St. Petersburg and did business there. One day, Cowart and August Carl Benz, who chartered boats at the marina, approached John Hunt, a sailmaker who had done work for Benz, about the possibility of smuggling a load of marijuana into the United States aboard Benz' forty-eight foot sailboat, the *Carpe Diem*. Hunt was interested, and shortly thereafter the three men, joined by Miller and Steve Maros (the boyfriend of Benz' secretary, Debra Engh), met at the Miller-Cowart residence and arrived at a plan. Hunt, as captain, and Douglas Lee, as crew member, would sail the *Carpe Diem* to the Cayman Islands; there Cowart would give them their final instructions and, with Maros aboard, they would sail to Aruba, in the Lesser Antilles, to pick up the marijuana and return to Florida. To minimize the possibility that Customs agents might foil the operation, Miller briefed Hunt on their modus operandi and showed him photographs of several agents stationed along the Florida Gulf coast whom he might encounter.

The smuggling operation began in late September. Hunt and Lee, with the aid of Miller and Cowart who helped them outfit

the *Carpe Diem* for the voyage, sailed the vessel to the Cayman Islands and there rendezvoused with Cowart and Maros, as planned. (Cowart, traveling under a false passport, had flown to the Islands.) Cowart instructed Hunt on how to proceed to Aruba and contact the marijuana source, a trawler off the Aruba coast. Hunt, following his instructions, took on Maros as an additional crew member and sailed the *Carpe Diem* to Aruba. He located the trawler, picked up 8,000 to 10,000 pounds of baled marijuana, and returned to a predesignated point off the Florida coast where he rendezvoused with Cowart, who was aboard a power boat, the *Suzi Q*. Hunt and Cowart then took the two vessels to Cedar Key, on the Florida Gulf Coast, where they and their crews offloaded the marijuana. Thereafter, Hunt and Maros sailed the *Carpe Diem* to a point off Hernando Beach, Florida and abandoned her. Cowart meanwhile abandoned the *Suzi Q*. Hunt and Maros then called Miller at her home in St. Petersburg and asked her to pick them up. She did so, and enroute to St. Petersburg they briefed her on what had transpired.

Customs officers subsequently found the *Carpe Diem* and the *Suzi Q* lying at anchor off the Florida coast and covered with marijuana residue. They seized the boats.[7] Benz, in an effort to set aside the forfeiture of his vessel, the *Carpe Diem*, presented, through his attorney, Anthony Gonzalez, a Petition in Remission or Mitigation of Forfeiture to Customs. Benz attached to his petition a charter agreement purporting to show that he had had the boat under charter to an Edgar Picado since September 1981. The charter agreement bore the signature "Edgar Picado," which Miller had signed.

Customs managed to learn that Hunt had captained the *Carpe Diem* in a marijuana smuggling venture, arrested him, and persuaded him to testify against his confederates. On September 16, 1982, the grand jury returned a two-count indict-

---

6. See *infra* part II. B. of the text.

7. Customs seized the vessels under the authority conferred by 19 U.S.C. § 1595a (1982).

ment, charging Miller, Benz, and the others, as we have indicated in the margin. *See supra* notes 1 and 2. Only Miller and Benz made themselves available for trial; their coindictees became fugitives. Prior to trial, Miller moved for a severance of parties on the ground that she would need to call Benz' attorney, Anthony Gonzalez, as a material witness; she represented that Gonzalez would testify that she had no knowledge that Benz would present to Customs the charter agreement she had signed as Edgar Picado. The court denied her motion.

At trial, the government called Hunt, who testified to the above events. Crew member Douglas Lee confirmed his story. The Customs agents testified to their discovery of the *Carpe Diem* and the *Suzi Q* and introduced the marijuana residue they had scraped off the two boats. Finally, the government established a fact that Miller does not contest, that she had written the signature "Edgar Picado" on the charter agreement Benz had submitted to Customs.

Miller's response to the government's case was to deny any knowledge of the smuggling conspiracy and of the illegal use Benz made of her Edgar Picado signature. Taking the witness stand, Miller admitted that Cowart had been her boyfriend and that she had known all of the conspirators socially; she insisted, however, that this was the extent of her relationship with them. She admitted signing Picado's name on the charter agreement, but stated that she had done so merely to accommodate Debra Engh, Benz' secretary. Debra Engh told her that the original of the document had been in a briefcase stolen from Engh's car and asked her as a favor to sign Picado's name on a replacement copy. Miller said that she signed Picado's name and saw no harm in doing it, because she actually thought, from some statements Cowart had made to her, that Picado had the boat. She had no idea, she said, that anyone would present the document to Customs.

To buttress this point, Miller endeavored to call to the stand Benz' attorney, Anthony Gonzalez, who was acting as Benz' lead trial counsel. Benz objected, and the court precluded counsel from testifying. Miller then moved for a severance. The court advised her that it would only abort her trial if she formally waived any right she might have to claim later that a retrial would subject her to double jeopardy. Miller signed a waiver form, purportedly relinquishing such a right, on advice of counsel, so that on retrial she could have the benefit of Gonzalez' testimony. Thereupon, the court declared a mistrial of Miller's case.

After the district court scheduled her case for retrial, Miller moved to dismiss the indictment, claiming that a retrial would constitute double jeopardy. The court denied her motion, and she immediately took an interlocutory appeal.[8]

On retrial, the government presented essentially the same evidence as at the earlier trial. Miller's defense did not change; she testified again that she had not known of any wrongdoing and had signed the name Edgar Picado merely to accommodate Debra Engh. Miller called Benz' attorney, Gonzalez, to bolster her claim that she did not know that the document would be presented to Customs as part of Benz' Petition for Remission or Mitigation of Forfeiture. He testified that he had prepared the petition and that the charter agreement, annexed to the petition, had previously been signed out of his presence, presumably by Edgar Picado. The jury found Miller guilty as charged on both counts, and, following the imposition of sentence, she appealed.

In these consolidated appeals, Miller presents alternative claims, each of which, if valid, would require us to acquit her on both counts. She challenges the trial court's denial of her double jeopardy motion and the sufficiency of the evidence to support her convictions.

---

8. *See supra* note 5. We declined to stay further proceedings in the district court pending our resolution of the interlocutory appeal.

## II.

### A.

In determining whether Miller's retrial was barred by the double jeopardy clause, we face two issues: whether Miller was placed in jeopardy twice within the meaning of the double jeopardy clause and, if so, whether, by executing the purported written waiver as a condition precedent to the court's termination of her first trial, she somehow relinquished her double jeopardy claim. Since we resolve the first issue against Miller, we need not decide the legal effect of the written waiver.

The double jeopardy clause of the fifth amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." The double jeopardy clause, however, is not an absolute bar to successive trials. *Justices of Boston Municipal Court v. Lydon*, — U.S. ——, 104 S.Ct. 1805, 1812, 80 L.Ed.2d 311 (1984). In the context we face here, retrial following the declaration of a mistrial, the key question for double jeopardy purposes is whether the mistrial was declared with the defendant's consent. *United States v. Dinitz*, 424 U.S. 600, 608, 96 S.Ct. 1075, 1080, 47 L.Ed.2d 267 (1976). If a mistrial is declared with the defendant's consent, he is deemed to have waived any double jeopardy claim he might otherwise have. If, on the other hand, the defendant wishes to proceed to a verdict by the jury empaneled to try him and the court declares a mistrial over his objection, the double jeopardy clause will bar the defendant's retrial unless manifest necessity required the court so to act. *Id.*; *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824). The only circumstance in which the defendant's consent to a mistrial does not operate as a waiver of his right to claim double jeopardy is where the prosecutor or the judge *intentionally provokes* the defendant to request the mistrial. *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 2091, 72 L.Ed.2d 416 (1982).

In this case, the defendant consented to the declaration of a mistrial. This becomes clear when one examines what occurred after Miller called Benz' trial attorney, Anthony Gonzalez, to the stand as the final witness for her defense. The judge immediately excused the jury, so he could consider counsel's argument on whether he should allow Gonzalez to testify over Benz' objection. Miller's counsel argued strenuously that either the court should allow Gonzalez to testify or it should sever Miller's case. The court informed Miller's counsel that what he was asking for was not a "severance" but a mistrial of his client's case, and that to discontinue the proceedings as to Miller without formally declaring a mistrial might create a double jeopardy problem. Miller's attorney responded that he would be glad to move for a mistrial if that is what it would take to terminate Miller's trial. The judge ended the colloquy by stating that he would not grant a mistrial unless Miller moved for one *and* signed a waiver of any double jeopardy objection she might have to a mistrial.

After a brief recess, Miller's counsel, in the presence of his client, moved for a mistrial, stating that he was doing so because he was "faced with the choice between waiving double jeopardy or calling Mr. Gonzalez and claiming [Miller's] Sixth Amendment privilege so to do, [and had] no alternative but to recommend to [my] client that she waive the double jeopardy claim in order to avail herself of her Sixth Amendment right." Miller then announced that she concurred in her lawyer's recommendation, and the court declared a mistrial.

Counsel now contends that his client did not consent to the mistrial. He does not persuade us. Counsel never indicated that even without Gonzalez' testimony Miller wished to proceed to a verdict at the hands of the jury empaneled to try the case. Rather, as the record plainly shows, after wrestling with the problem of whether to proceed to a verdict without Gonzalez' testimony or to try the case over with his testimony, he opted for the latter course and moved for a mistrial.

■ Counsel argues that Miller's decision to request a mistrial was "provoked" by the trial judge's blatantly erroneous refusal, prior to trial, to grant her request for a severance of parties and that the narrow exception set forth in *Kennedy, supra,* should apply. We find no evidence of bad faith or intentional provocation on the part of the trial judge in this case;[9] accordingly, the *Kennedy* exception has no application.

■ In sum, Miller was faced with a trial strategy decision a defendant often encounters after prejudicial error has allegedly occurred, whether to move for a mistrial or to proceed on to a verdict in the hope of obtaining an acquittal. Absent intentional judicial or prosecutorial provocation, a defendant who obtains a mistrial is deemed to have anticipated a retrial.

## B.

■ We review Miller's claim that the evidence was insufficient to support her convictions by viewing the evidence in the light most favorable to the jury verdicts and determining whether a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt. *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc) *aff'd on other grounds,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt...." *Id.* The evidence in this case, assessed under this standard, was certainly sufficient to support Miller's conviction on both counts.

■ To convict Miller of conspiracy, the jury had to find that a conspiracy existed and that Miller knew of the conspiracy and agreed to participate in it. *United*

*States v. Marszalkowski,* 669 F.2d 655, 661 (11th Cir.), *cert. denied,* 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 167 (1982). While, as Miller correctly points out, "mere presence" is not enough to support a conspiracy conviction, the testimony here showed her to be more than simply present when the conspirators happened to be together in pursuance of their smuggling plan. Miller played a vital role in the operation. Most importantly, she contributed her considerable knowledge of Customs' investigatory techniques and briefed Hunt on how to avoid detection, showing him photographs of several Customs agents who might cross his path. Thereafter, she and her boyfriend, Cowart, assisted Hunt and Lee in preparing the *Carpe Diem* for its long voyage through the Caribbean Sea. When Cowart flew to the Cayman Islands to give Hunt his final instructions, she accompanied him, renting the hotel room where they stayed and the car they used to travel about. She also knew that Cowart had traveled to the Islands under a false passport, one that bore his photograph but a fictitious name. Finally, Miller was the one Hunt and Maros called to pick them up after they abandoned the *Carpe Diem* off Hernando Beach and in whom they confided the details of the offloading they had just accomplished. Certainly the jury was entitled to conclude from Miller's activities that Miller was a knowing and willing participant in the marijuana scheme.

■ The evidence was fully sufficient for the jury to convict Miller on the second count as well. She forged the name Edgar Picado to the false charter Benz submitted to Customs, and she did so after Customs had seized the *Carpe Diem*. It was permissible for the jury to infer that this knowledgeable former Customs employee knew precisely what use Benz would make

---

**9.** Though appellant has not assigned as independent reversible error the district court's pretrial ruling denying her motion to sever the parties, she implicitly attacks that ruling in the context of her double jeopardy claim. We therefore have examined the pretrial denial of severance and find it to have been well within the court's discretion. Appellant wanted the severance so

that Gonzalez could testify that she did not know that Benz would submit the false charter agreement to Customs. The district court apparently was not impressed with her proffer, and, as we disclose in the text, the court's impression proved correct: Gonzalez was unable to say anything regarding appellant's activities or her knowledge.

of the document; he would submit it to Customs so he could recover his boat.

 The jury, however, was not even required to make such an inference to find Miller guilty on the second count. The government was not required to prove that Miller knew the false document would be submitted to Customs; she subjected herself to liability under 18 U.S.C. § 1001 (1982) when she knowingly forged the name Edgar Picado. *See United States v. Yermian,* — U.S. —, 104 S.Ct. 2936, 82 L.Ed.2d 53 (1984); *United States v. Baker,* 626 F.2d 512 (5th Cir.1980). In her own testimony she admitted the conduct making out a section 1001 offense. The justification she offered, that Debra Engh asked her to sign the form and that she did so merely to accommodate Engh, did not negate the legal effect of her conduct.

AFFIRMED.